# Big Four Mills, Limited, v. Commercial Credit Co., Inc., et al.

January 16, 1948.

Rehearing denied June 25, 1948.

614

John L. Vest, Vest & Vest and Bert J. King for appellant.
Stephens L. Blakeley and C. E. Schindler for appellees.

OPINION OF THE COURT BY CLAY, COMMISSIONER—Affirming.

This suit was brought by Commercial Credit Company, Inc., a Maryland corporation (hereinafter referred to as "Commercial"), against Big Four Mills, Ltd., a Kentucky corporation (hereinafter referred to as "Big Four"), to recover money due under a written contract, for an accounting and for the appointment of a receiver. The action was described by the trial Court in one of its opinions as "a plain, simple suit on account."

Commercial's motion for the appointment of a general receiver was denied, but a special receiver was appointed for the purpose of collecting certain assigned accounts. On final submission judgment was entered against Big Four for the sum of $188,792.91.

The undisputed facts are that on December 2, 1940, Big Four and Commercial entered into a written contract whereby Commercial agreed to advance to Big Four from time to time eighty percent of the gross face value of accounts assigned to it. Big Four agreed to pay certain "charges" on these advancements, at rates ranging from 1/28 of 1% to 1/39 of 1% per day on the average daily outstanding face of accounts. Though there is some controversy as to the nature of this contract, we will accept Big Four's view that it was simply a loan agreement and the so-called "charges" were nothing more or less than interest on the money loaned.

Under the above contract and subsequent modifications thereof (the original and modifications being hereinafter referred to as "contract"), Commercial advanced to Big Four from December 1, 1940 to May 25, 1942 approximately $130,000.

After suit was filed by Commercial, Big Four over a period of years filed numerous answers, amended answers, counter-claims, set-offs and cross-petitions in a vigorous campaign to not only defeat Commercial's claim but in an attempt to recover substantial unliquidated damages. To some of Big Four's pleadings the trial Court sustained demurrers, to others it struck out certain paragraphs, and it refused to permit Big Four to file a fifth amended answer and counter-claim. The

damages asked by Big Four in the various pleadings ranged from $50,000 to $800,000.

Big Four complains bitterly of practically every action taken by the lower Court throughout these proceedings. The record in this case is voluminous, consisting of approximately 2,500 pages. Big Four's counsel has filed briefs on this appeal totaling 398 pages. Its argument for reversal is set forth in no less than 16 numbered propositions, plus one supplemental proposition. We have carefully considered all of the contentions made by both parties, and in this opinion will limit ourselves to what we consider the true merits of the case.

■ Is Commercial the real party in interest in this litigation?

Big Four has devoted a substantial portion of its pleadings and its briefs to the proposition that Commercial is a "dummy" or "pseudo" corporation, that it is not the proper party plaintiff in this action, and that its parent corporation should be made a party. Big Four alleged that all of the stock of Commercial, a Maryland corporation, was owned by Commercial Credit Company, a Delaware corporation; that the Delaware corporation also owns all of the stock in four Kentucky corporations; and because of these facts the "Commercial Credit Constellation of the Financial Heavens" is some sort of evil institution which by sham, subterfuge and legal trick engages in the business of lending money at usurious and illegal rates of interest.

We have difficulty in determining what Big Four intended to accomplish by its pleadings along the above lines and the argument in its briefs. The ownership of all or a substantial portion of the capital stock of one corporation by another corporation does not create an identity of corporate interest. Harlan Public Service Company v. Eastern Construction Company, 254 Ky. 135, 71 S. W. 2d 24; Kentucky Auto Mechanics Service Co., Inc. v. Kentucky Auto Parts Co., Inc., et al., 267 Ky. 531, 102 S. W. 2d 1022.

We are, of course, aware of the principle that a court will on appropriate occasions ignore the distinction between corporate entities where its recognition

would operate as a shield for fraudulent or criminal acts or where subversive of the public policy of a state.

As stated in 13 Am. Jur., "Corporations," Section 7, page 160: "In an appropriate case and in furtherance of the ends of justice, a corporation and the individual or individuals owning all its stock and assets will be treated as identical, the corporate entity being disregarded where used as a cloak or cover for fraud or illegality."

In C. L. & L. Motor Express Co., Inc., et al. v. Achenbach, 259 Ky. 228, 82 S. W. 2d 335, we decided the corporate entity may be disregarded "in order to circumvent fraud or to remove a mere shield against responsibility." 259 Ky. at page 237, 82 S. W. 2d at page 339.

The difficulty with Big Four's position is that it has failed to allege any facts other than stock ownership which would justify a court in ignoring the existence of Commercial as a legal entity. The allegations with respect to sham, subterfuge and legal trick are simply argumentative conclusions based on no stated facts which would indicate that Commercial committed any fraud or is attempting to dodge any legal responsibility. Stock ownership of one corporation by another is not ipso facto an evil, nor can we perceive that the contract involved is fraudulent or criminal or otherwise illegal.

If we are to assume that the Delaware corporation was the dominating parent, there appears no reason to inject it into this law suit. Big Four entered into a contract with Commercial, known to be a lawfully created Maryland corporation. It being a distinct legal entity, it is the real party in interest in this controversy.

■ Was Commercial doing business in Kentucky during the term of this contract without qualifying, so as to deprive it of the right to maintain this suit?

On this point Big Four makes the following contentions: (a) since the Delaware corporation is the parent of Commercial and since the parent corporation owns all of the stock in certain Kentucky corporations, therefore the Delaware corporation, the real party in interest, is doing business in Kentucky, and (b) Commercial

was actually doing business in the state because of its activities here. The objective of Big Four's argument on this point is to show that Commercial, or its parent, while doing business in the state, were not qualified under our laws and therefore could not sue Big Four in this jurisdiction.

Since we have already disposed of the Delaware corporation, it is unnecessary to pursue proposition (a). Insofar as proposition (b) is concerned, the record does not indicate that Commercial was actually doing business in Kentucky to such an extent as to require its qualification here. As far as we know, the transactions with Big Four were the only ones which might constitute Kentucky business, and as will be discussed more fully later, this business was actually conducted in Maryland.

A transaction somewhat similar to that involved here was considered in Jones v. General Motors Acceptance Corporation, 205 Ky. 227, 265 S. W. 620. The corporation in that case was organized under the laws of New York. It was engaged in the business of financing automobile dealers by discounting notes received from purchasers. These notes and assignments executed by the dealers were sent to the company's office in Detroit. The Court found that the corporation did not make or have any contracts in this state nor did it have an agent securing or soliciting business in Kentucky and it neither discounted nor accepted any notes or assignments here. It was held not to be doing business in Kentucky. Similar conclusions on similar facts were reached in Refrigeration Discount Corporation v. Metzger, D. C. Pa., 10 F. Supp. 748; Bank of America v. Whitney Cent. Nat. Bank, 261 U. S. 171, 43 S. Ct. 311, 67 L. Ed. 594.

If we were to assume, however, that Commercial had been doing business in Kentucky without having qualified, it did not forfeit the right to sue in this jurisdiction. Williams v. Dearborn Truck Company, 218 Ky. 271, 291 S. W. 388; Falls City Machinery & Wrecking Company v. Sobel-Mark Furniture Company, 219 Ky. 195, 292 S. W. 814; Country Home Light & Power Company v. J. J. Fitzgerald Company, 219 Ky. 313, 292 S. W. 833; Hoopes Brothers & Thomas Company v. Adams, et al., 221 Ky. 527, 299 S. W. 162; Robb v.

Midland Acceptance Corporation, 225 Ky. 258, 8 S. W. 2d 377.

Big Four recognizes that the above five cases now constitute the law of Kentucky, but requests this Court to overrule them. We are not constrained to do so. It is not the province of the Court to penalize a foreign corporation for failure to comply with our laws where the Legislature has specifically provided criminal penalties for such violations. This question has had very careful consideration on a number of occasions, and we still feel that the conclusions reached in the above cited cases are sound. Therefore, whether or not Commercial was doing business in this state, it had the right to bring this suit.

■ Is the contract sued upon a Maryland contract or a Kentucky contract?

We now come to one of the important questions in the case because its determination affects the amount of interest which may be recovered by Commercial. Admittedly the charges provided in the contract constitute a rate of interest in excess of 6% per annum, the legal rate under our statute. (360.010, KRS). The Maryland law, while also providing a legal interest rate of 6% further provides "no corporation shall hereafter interpose the defense of usury in any action at law or in equity." (Bagby's "Annotated Code of Maryland," Art. 23, Section 131). If the Maryland law applies, Big Four cannot rely on the defense of usury.

The question as to the particular state law which shall govern the construction and enforcement of a contract is one of the most confusing in the field of conflict of laws. Decisions from various jurisdictions apply three different rules: (1) the place of making, (2) the place of performance, and (3) the place of intent. See 11 Am. Jur., "Conflict of Laws," Section 116. In the present case, without the necessity of making fine distinctions, it is apparent that the contract involved was made in Maryland, was performed there, and it was intended by the parties that the Maryland law should control.

The contract shows on its face that it was "accepted at Baltimore, Maryland" by Commercial. As final

action on the contract was to be taken by Commercial's representatives in Baltimore, it is apparent that Maryland was the state where the contract was made. Big Four argues that the modifications made July 3, 1941 were finally accepted by it in Covington, because the contract was not sent to Big Four until July 5 and the parties had theretofore agreed upon the change. It is to be noted, however, that the contract sent to Big Four had not been *signed* by two officials of Commercial, and *by its terms* it could not become effective until so executed on behalf of Commercial. The final act of signing was done in Baltimore, Maryland, and that was the place where the contract was made.

Not only was the contract made in Maryland, but it was performed there. Big Four maintained a bank account in a Baltimore bank through which business with Commercial was transacted. Schedules of accounts were sent to Baltimore, and upon their acceptance there, the prescribed percentage of face value was advanced by the issuance of Commercial's check which was deposited in Big Four's Baltimore account. The reports of collections were sent to Commercial at Baltimore, and the accounts and amounts collected on these accounts were deposited there. Maryland was then the place of performance.

Finally, a provision in the contract recites that it "shall be construed and governed by the laws of the state where it is accepted by Commercial Credit." The contract was accepted by Commercial in Baltimore, and nowhere else. Consequently, it was the expressed intent of the parties that the Maryland law should control.

In view of the above facts, it seems clear that the original agreement and its modifications were Maryland and not Kentucky contracts. See Merchants' & Manufacturers' Securities Company v. Johnson, 8 Cir., 69 F. 2d 940; United Divers Supply Co. v. Commercial Credit Co., 5 Cir., 289 F. 316, 319, and Brierley et al. v. Commercial Credit Company, D. C. Pa., 43 F. 2d 724.

Our conclusion that this is a Maryland contract does not, however, finally solve the problem. If its terms, the place of its making and performance were simply devices to evade the usury laws of Kentucky,

this Court would not be bound to apply the Maryland law which denies a corporation the defense of usury.

The important considerations are thus stated in 11 Am. Jur., "Conflict of Laws," Section 156:

"The first and most important rule for the determination of the governing law in such a case is that if a note or obligation is valid where made, it is equally valid in any other state in which an action is brought upon it or whenever it is otherwise sought to be enforced * * *. Usury laws are not so distinctive a part of the public policy of the forum that the courts will, on the ground of public policy, decline to enforce any contract which would be invalid, if tested by them, though valid according to its proper law."

Section 157: "There is one broad fundamental principle that seems to pervade the cases dealing with the conflict of laws with respect to interest and usury and this is to accept, as the governing law, that law with reference to which the parties, acting in good faith and not for the purpose of evading the law of the real situs of the contract, intended to contract. The almost unanimous decision is that where residents of different jurisdictions contract for the loan of money, if the obligation is made in one state, but is to be performed in another, the parties are at liberty to regard it as a contract of either state and to stipulate for the higher rate of interest allowable in either, provided that in so doing they act in good faith and that the form of the transaction is not adopted to disguise its real character. If it is a bona fide transaction, the contract will be sustained; if it is a device for securing usurious interest, it will be held invalid. Where the parties have by the express terms of the contract designated the governing law, the only question for the court is whether they acted in good faith or in bad faith and for the purpose of evading the law of the place to which their contract was really referable."

The above principle is supported by the overwhelming weight of authority in the federal and numerous state jurisdictions. See excellent note in 125 A. L. R. 482. It was recognized as the governing general rule in Commonwealth Farm Loan Company v. Caudle, Administrator, et al., 203 Ky. 761, 263 S. W. 24, one of the

principal cases relied upon by Big Four. See also Jones v. Bank of Tennessee, 47 Ky. 122, 46 Am. Dec. 540.

Implicit in the rule is that some vital element of the transaction (i. e. execution, performance, intent) is connected with the state whose law is sought to be invoked. If so, we should respect the presumption that the parties intend to enter into a legal rather than an illegal contract. Bundy v. Commercial Credit Co., 200 N. C. 511, 157 S. E. 860.

While usury laws are designed to protect debtors from payment of exorbitant interest, differing laws of different states, and particularly those which remove corporations from this protection, demonstrate clearly that interest itself is not such an evil as to be abhorrent to a general public policy. It is true that a higher rate of interest than 6% is contrary to the public policy of this state as expressed by the Legislature. We are of the opinion, however, that this law should not be invoked to void or impair a contract entered into between two corporations in good faith under laws of another state which has a different statutory policy. See 11 Am. Jur., "Conflict of Laws," Sections 126 and 158.

The cases relied upon by Big Four, including United States Savings & Loan Company v. Scott, 98 Ky. 695, 34 S. W. 235; Locknane v. United States Savings & Loan Co., 103 Ky. 265, 44 S. W. 977; Commonwealth Farm Loan Company v. Caudle, Administrator, et al., 203 Ky. 761, 263 S. W. 24, were cases wherein either the creditor was actually doing business in the state, or the contracts were Kentucky contracts, or it appeared that the transactions were schemes or devices to evade the usury laws of Kentucky. These transactions lacked the two essential components we consider necessary, i. e., (1) at least one vital element of the contract must be associated with the foreign state, and (2) the transaction must be entered into in good faith.

In the present case the contract was made in Maryland, it was performed there, and the parties expressed the intention that the laws of that state should govern. We have searched this record in vain for evidence of bad faith upon the part of Commercial in entering into this contract. We can find nothing reprehensible in the doing of business by a Maryland corporation in accord-

:ance with the laws of its home state. We therefore conclude that the contract should be enforced in conformity with Maryland law.

■ Did Commercial violate the Kentucky "Small Loan Act"? (Section 883i-21, Carroll's Kentucky Statutes 1936, Section 288.160, KRS).

The "Small Loan Act" prohibits the charging, contracting for, or receiving interest greater than 6% per annum upon any loan in the amount or value of $300 or less and provides that any transaction in violation of the Act shall be invalid and unenforceable. Big Four insists that a substantial portion of the advancements made to it constituted loans of less than $300, and that such loans cannot be collected under the Kentucky statutes. It asserts that there were 2,684 separate loans in this category, because such number of *accounts* assigned to Commercial were for less than $300.

There are two answers to this contention: (1) the transactions with Big Four were Maryland transactions and the Maryland and not the Kentucky law applies, and (2) while some of the accounts were for less than $300, on no occasion did Commercial advance or loan to Big Four an amount less than $300. The accounts were security and their face amounts did not constitute the loans. For these two reasons the "Small Loan Act" is obviously inapplicable.

■ Did the Court err in sustaining demurrers to or striking out various answers, counter-claims, cross-petitions and intervening petitions of Big Four which sought to recover unliquidated damages for an alleged conspiracy to injure Big Four's business?

The allegations of conspiracy are in substance that Commercial had induced defendant to change its method of business, had circulated false rumors and reports concerning its business, and had thereby damaged it to a great extent. The basis of the Court's rulings on these pleadings was that since Big Four was attempting to set up tort claims for unliquidated damages, they could not be tried in this suit based upon contract. The lower Court in a well reasoned opinion of November 3, 1942 pointed out that these pleadings were not permissible under Section 96 of the Civil Code for the following

two reasons: (1) if the claims were considered counterclaims, they could not be asserted because not arising "out of the contract, or transactions, stated in the petition as the foundation of the plaintiff's claim, or which is connected with the subject of the action," (sub-section 1, section 96, Kentucky Civil Code) and (2) if the claims were considered as set-offs, they could not be set up in this action because not arising upon "a contract, judgment or award." (sub-section 2, section 96, Kentucky Civil Code).

Counsel for Big Four requests this Court to ignore or repeal Section 96 of the Civil Code insofar as it might "affect Big Four's right to set up this claim against Commercial." No justification for doing so appears.

It is true that this Court has permitted a claim for unliquidated damages to be asserted against a non-resident plaintiff where the claim arises out of the same transaction upon which the plaintiff sues. Bates et al. v. Reitz, 157 Ky. 514, 163 S. W. 451. But as pointed out in Damron and Stephens, Trustee v. Sowards, Ex-Sheriff, et al. 203 Ky. 211, 261 S. W. 1093, such a claim cannot be set up when it is not connected with, affects or is affected by, the original cause of action. That is the situation we have here. The alleged conspiracy and damage to Big Four is, as in the above case, based on subsequent wrongs alleged to have been committed by Commercial after the obligations created by the contract had accrued. While a multiplicity of suits should be avoided if possible, we cannot shut our eyes to Section 96 of the Code and the reason underlying its provisions. The trial Court correctly stated:

"Applying the principles of the decisions to which we have referred to in the instant case, we are constrained to conclude that the acts of conspiracy charged against plaintiff are independent acts which do not arise out of the contract or transaction stated in the petition and which are not connected in any way with the subject of the action. They do not affect nor are they affected by the original cause of action. A reading of these alleged wrongs, most of which arose long after the occurrence of the transaction by which the original debt was created, makes it painfully clear that they are

not connected with the subject of the action. Section 96 of the Code compels this conclusion, notwithstanding the cherished policy of the law to avoid and prevent circuity of actions and multiplicity of suits to allow the entire controversy between the parties to be determined in one action, and notwithstanding any inconvenience and hardship worked upon defendant by reason of the fact that defendant must pursue its action against a non-resident plaintiff in a state other than Kentucky. We cannot close our eyes to the provisions of the law.''

The propriety of the Court's ruling is amply sustained by Lykens v. Bowling & Lawson, 188 Ky. 137, 221 S. W. 519; Damron and Stephens, Trustee v. Sowards, Ex-Sheriff et al., 203 Ky. 211, 261 S. W. 1093, and Weinstein v. Rhorer et al., 255 Ky. 179, 73 S. W. 2d 25.

■ Should the Court have ordered Big Four to pay certain funds on account during the pendency of the action?

Big Four complains bitterly that while the action was pending the trial Court both indirectly and directly compelled it to pay a total sum of $24,000 to the special receiver before final judgment was entered. There are two reasons why this contention deserves scarcely passing notice: (1) no objection was made to the orders of the Court at the time they were entered and most of the payments were made voluntarily, (2) since Big Four was indebted to Commercial for an amount substantially in excess of $24,000, Big Four has not been prejudiced by these payments.

■ Should Commercial's attorney have been appointed attorney for the special receiver?

What we have said above under item 6 applies here also. The record shows that Big Four did not take exception to this appointment, and it is not shown whereby Big Four was in any way prejudiced thereby.

■ Was the special receiver negligent in the collection of claims to such an extent that he should forfeit his right to compensation?

Big Four's contention on this point is that because some of the accounts were insured and no money was

collected from the insurance company, the receiver was negligent in the discharge of his trust. We have carefully considered the record and find no merit in this contention. Under the terms of the policies, no recovery could be had unless the debtor was insolvent. Only three debtors owing a total sum of approximately $2,000 were shown to be insolvent. The record shows that no claims were filed upon these policies by Big Four within the time prescribed by the insurance contract. When the policies finally were turned over to the receiver, this time limit had expired and no collections could be made on the defaulted accounts.

■ Did the lower Court correctly compute the principal and interest due Big Four to the date of judgment, October 18, 1945?

On this question it is necessary to construe the terms of the contract, even though we have decided that the interest in excess of 6% was not illegal. Big Four contends that the charges based on a specified rate of interest per day must be calculated on the *amount of money actually advanced* by Commercial, whereas Commercial insists that the rate shall be based upon the *face value of the accounts assigned.*

It is true the contract provides in one place that the advances to Big Four shall be made on the face value "of Accounts, less a charge equal to the highest contract rate of interest on the money outstanding thereon." This provision clearly does not refer to the outstanding money loaned but to the outstanding money due on the *accounts.* It is entirely consistent with the second literary paragraph of the contract which provides (our italics):

"At the end of each month Commercial Credit will bill Customer for charges in connection with the purchase of Accounts during such month, and for the services and consideration specified herein, which shall include the charge mentioned in line 7 hereof. Customer will pay said charges within five days after date of such billing. Said charges shall be computed upon the basis of the *average daily outstanding face of Accounts* during such month, the charges to be determined by applying against such *average daily outstanding face of Accounts* the proper percentage shown below, depending

upon the amount of the *average daily outstanding face of Accounts* during such month:

| Average Daily Outstanding Face of Accounts During Month | Rate Per Day |
| --- | --- |
| 00 to 15,000 | 1/28 of 1% |
| 15,001 to 50,000 | 1/35 of 1% |
| 50,001 and over | 1/39 of 1%" |

It is impossible to read the above provision in the contract and have any question as to the basis of the charges. In that short paragraph the phrase "average daily outstanding face of Accounts" is used no less than four times. Big Four could not have misunderstood the basis of the charges. It is therefore our opinion that the Court adopted the proper method of calculating the charges, or interest, to the date of judgment.

In this opinion we have not discussed each minute question raised by Big Four. We have, however, considered every contention presented, and agree with the lower Court that Big Four has, and had, no defense to this suit and if it does have other causes of action against Commercial, they must be asserted in another action. The record indicates that the lower Court conducted this case in an exemplary manner and in such a way as to give Big Four every opportunity to present any valid defenses or claims which it might have had.

The judgment is affirmed.