395 So.2d 507 (1981)
CONTINENTAL MORTGAGE INVESTORS, a Massachusetts Business Trust, Petitioner,
v.
SAILBOAT KEY, INC., a Florida Corporation, Respondent.
No. 53490.
Supreme Court of Florida.
February 12, 1981.
Rehearing Denied April 13, 1981.
Thomas G. Schultz of Holland & Knight, Miami, for petitioner.
Richard L. Lapidus of Lapidus & Stettin, Miami, for respondent.
SUNDBERG, Chief Justice.
This petition for writ of certiorari arises from a money judgment awarded to Sailboat Key, Inc., a Florida borrower. The award was based on a claim that an interstate loan made by Continental Mortgage Investors, a Massachusetts business trust, violated Florida usury laws. Chapter 687, Fla. Stat. (1975). Though a myriad of issues was presented by both sides, we find the conflict of laws issue to be dispositive.[1] The question presented is whether the courts of this state will recognize a choice of law provision designating foreign law in an interstate loan contract which calls for interest prohibited as usury under Florida law but supportable under the chosen foreign *508 law. We conclude that in an interstate commercial loan transaction with which several states have contacts and in which usury is implicated, Florida courts will recognize a choice of law provision provided by the parties so long as the jurisdiction chosen in the contract has a normal relationship with the transaction. Under the circumstances of this case, we hold that Continental Mortgage Investors, a real estate investment trust organized under the laws of Massachusetts with its only office in Massachusetts where it carries on its business, has a sufficient nexus with Massachusetts to support a choice of law provision in favor of that state's law.

I. Factual Background
In late 1969, Sailboat Key, Inc. (Sailboat Key), a Florida real estate development corporation, applied for a land development loan through Mortgage Consultants,[2] a Coral Gables management firm contracted by Continental Mortgage Investors to originate, underwrite and recommend loans for the trust. Continental Mortgage Investors (Continental) is a Massachusetts business trust dealing in extensive multistate lending, formed in 1961 with its only office in Boston, residence of a majority of the original trustees. On December 30, 1969, after approval by the trustees in Boston, Continental sent a loan commitment letter to Sailboat Key which included among its thirty terms the following: (1) a two-year loan of $3,500,000 at 14% per annum, secured by the property to be developed; (2) a discount, stock interest in the borrower corporation, and a commitment fee; and (3) a choice of law provision declaring the intent of the parties to be that Massachusetts law govern all parts of the loan commitment. Mortgage Consultants prepared the loan documents, and the closing took place in Boston on January 22, 1970, at which time a loan agreement, a note secured by a first mortgage, a stock pledge agreement, and guarantees were executed. Each of these documents, except for the stock pledge agreement, contained a choice of law provision specifying Massachusetts law as the applicable law. It is undisputed by the parties that applicable Massachusetts law does not provide usury penalties to the borrower in these circumstances.[3] The note was made payable at Continental's Boston office.
In late 1971, Sailboat Key because of its default found it necessary to enter a settlement agreement with Continental, which advanced an additional $400,000 and certain other considerations in return for Sailboat Key's promise to pay $740,000 plus an amount for the stock which Continental held. The settlement agreement modifying the loan agreement was signed on October 22, 1917, in Boston and Sailboat Key executed two new notes. Sailboat Key, to implement the agreement, borrowed $6,000,000 from another lender, Fidelity Mortgage Investors, to refinance the land development. On November 5, 1971, Sailboat Key paid Continental all of the money then due under the settlement agreement, leaving approximately $550,000 owing on one of the settlement agreement notes, due to Continental on November 1, 1976. Continental had agreed to subordinate its mortgage position for this amount to a second lender, Fidelity Mortgage Investors.
Three years later, Sailboat Key and Continental were joined as defendants by Fidelity Mortgage Investors in the foreclosure of its first mortgage. Sailboat Key cross-claimed for usury against Continental; Continental cross-claimed to foreclose its subordinated mortgage. These cross-claims were severed from the main action upon motion, and a special master was appointed as a fact finder with regard to interest computations. Continental then voluntarily dismissed its cross-claim, leaving only Sailboat Key's usury claim. Based upon the special master's findings and after hearing testimony, the trial court, applying Florida *509 law, found the entire loan agreement to be usurious and assessed a penalty of twice the interest charged, plus costs. The District Court of Appeal, Third District, affirmed the award, upholding the application of Florida law on the basis of public policy and a finding by the trial court that the parties' choice of Massachusetts law was made in bad faith and was an effort to avoid Florida usury laws. Continental Mortgage Investors v. Sailboat Key, Inc., 354 So.2d 67 (Fla. 3d DCA 1977).

II. Conflict of Laws: Usury

A. Public Policy
As with most shibboleths, the invocation of strong public policy to avoid application of another state's law is unwarranted in this case. Although a few jurisdictions do attach such a public policy to their usury laws, it is generally held that usury laws are not so distinctive a part of a forum's public policy that a court, for public policy reasons, will not look to another jurisdiction's law which is sufficiently connected with a contract and will uphold the contract. See Ury v. Jewelers Acceptance Corp., 227 Cal. App.2d 11, 38 Cal. Rptr. 376 (1st Dist. 1964); Santoro v. Osman, 149 Conn. 9, 174 A.2d 800 (1961); Big Four Mills, Ltd. v. Commercial Credit Co., 307 Ky. 612, 211 S.W.2d 831 (1948); Exchange Bank & Trust Co. v. Tamerius, 200 Neb. 807, 265 N.W.2d 847 (1978); 45 Am.Jur.2d, Interest and Usury § 19 (1969). The few courts that do rely on a public policy exception in a usury-choice of law situation invariably are dealing with the individual, and often consumer, borrower. See, e.g., Lyles v. Union Planters National Bank, 239 Ark. 738, 393 S.W.2d 867 (1965).[4] We do not think the mere fact that there exists in Florida a usury statute which prohibits certain interest rates establishes a strong public policy against such conduct in this state where interstate loans are concerned.
The usury statute itself, fraught as it is with exceptions, belies the imputation of a strong public policy. See § 687.031, Fla. Stat. (1975). In 1975 The Florida Consumer Finance Act allowed interest on small loans as high as 30% per annum, in contrast to the general usury ceiling of 10% per annum. § 516.031, Fla. Stat. (1975). The Savings Association Act made usury limits simply inapplicable to building and loan associations. §§ 665.395, 687.031, Fla. Stat. (1975). Under the Banking Code, banks could charge up to 18% per annum on certain loans. § 659.181, Fla. Stat. (1975). Florida has long recognized the general exception to usury laws of the time-price doctrine. See Davidson v. Davis, 59 Fla. 476, 52 So. 139 (1910). The usury law does not apply to the sale of bonds, or mortgages on those bonds, section 687.03(1), Florida Statutes (1975), or to the transfers of negotiable paper in certain cases, section 687.04, Florida Statutes (1975).
The legislature recently raised the maximum interest rates allowable under the usury laws, demonstrating that this public policy is at very least relatively flexible in a confrontation with commercial reality. See Ch. 79-274, § 13, Laws of Florida. Nor do we consider usury protections fundamental to a legal system. The defense of usury is a creature entirely of statutory regulation, and is not founded upon any common-law right, either legal or equitable. Matlack Properties, Inc. v. Citizen & Southern National Bank, 120 Fla. 77, 162 So. 148 (1935). Finally, we note the limited effect of the usury laws upon a contract. "[T]he usury statutes in this jurisdiction do not have the effect of invalidating contracts for [usurious] interest ... but only accord to the obligor the personal privilege of setting up ... affirmative defenses of usury in respect to such contracts." Yaffee v. International Co., 80 So.2d 910, 912 (Fla. 1955).
The cases cited by the district court are not strong support for its invocation of public policy. Bond v. Koscot Interplanetary, Inc., 246 So.2d 631 (Fla. 4th DCA 1971), cert. denied, 283 So.2d 866 (Fla. 1973), merely stands for the truism that an agreement *510 against public policy is unenforceable, but does not delineate public policy in terms of usury. Davis v. Ebsco Industries, Inc., 150 So.2d 460 (Fla. 3d DCA 1963) and C & D Farms, Inc. v. Cerniglia, 189 So.2d 384 (Fla. 3d DCA 1966), are inapposite since they deal with covenants-not-to-compete, and do not help us understand the strength of the very different policies underlying the usury laws.[5]
Finding no real support in our case law for the use of the public policy exception under these circumstances, and in view of the pervasive exceptions to the usury laws and the actual operation of these laws, we are unable, particularly in the commercial setting of this case, to glean any overriding public policy against usury qua usury in a choice of law situation.

B. Conflict of Laws Rule
The courts of this state have never directly confronted conflict of laws in a usury setting when another state's law chosen by the parties will uphold the agreement. A general rule for choice of laws in a contracts situation might be derived from Thomson v. Kyle, 39 Fla. 582, 23 So. 12 (1897), which followed the traditional place of execution and place of performance. We have applied this rule in contractual choice of laws situations to which Florida could probably apply its usury penalties, and the parties did not indicate a controlling law. Goodman v. Olsen, 305 So.2d 753 (Fla. 1974), cert. denied, 423 U.S. 839, 96 S.Ct. 68, 46 L.Ed.2d 58 (1975) (applying New York law to find no usury).[6] But such a test is today of little practical value since these contacts are so easily manipulated in our mobile society.
Courts in almost every jurisdiction recognize that a usury claim presents a distinct choice of laws question. The rule that the overwhelming majority follows may be stated as follows:
[W]ith respect to the question of usury, it may be stated as a well-established rule that a provision in a contract for the payment of interest will be held valid in most states if it is permitted by the law of the place of contracting, the place of performance, or any other place with which the contract has any substantial connection.
Fahs v. Martin, 224 F.2d 387, 397 (5th Cir.1955). This "traditional" or "federal" rule is derived directly from Seeman v. Philadelphia Warehouse Co., 274 U.S. 403, 47 S.Ct. 626, 71 L.Ed. 1123 (1927), in which a Pennsylvania corporation made a loan to a New York borrower who sought protection of New York usury laws. The Supreme Court concluded that the parties could contract for a higher rate of interest allowed by either place of performance, place of execution, or a place with a vital and natural connection. Id. at 408, 47 S.Ct. at 627. Citing Miller v. Tiffany, 68 U.S. (1 Wall.) 298, 17 L.Ed. 540 (1864), the court explained that the qualification of "good faith" required in that case must not be taken too literally:
The effect of the qualification is merely to prevent the evasion or avoidance at will of the usury law otherwise applicable, by the parties' entering into the contract or stipulating for its performance at a place which has no normal relation to the transaction and to whose law they would not otherwise be subject.
Id. at 408, 47 S.Ct. at 627 (emphasis added). This language makes clear that if a "normal relation" does exist, then good faith is not otherwise necessary to validate the transaction.
*511 There is no disagreement among commentators in the conflict of laws field that this view is generally followed. Professor Beale wrote: "[T]he rule has become well settled in almost all jurisdictions, too well settled to be changed except by statute, that if a contract is made and to be performed in different states, and is usurious by the law of one of these places but not by that of the other, it is governed, according to the presumed intention of the parties, by the law of the place which makes it valid." 2 J. Beale, Conflict of Laws, § 347.4 (1935) (footnote to multitudinous citations omitted). See also H. Goodrich & E. Scoles, Conflict of Laws, § 111 (4th ed. 1964); G. Stumberg, Conflict of Laws, 237-40 (2d ed. 1951).
As Professor Beale noted, the historical rationale underlying this rule of validation was the presumption that the parties had contracted with reference to the law of the place where the transaction would be valid. See Atlas Subsidiaries, Inc. v. O. & O., Inc., 166 So.2d 458, 461 (Fla. 1st DCA 1964). This rationale has become modified in modern times because of the frequent inclusion of specific choice of law provisions in commercial, multistate contracts. The focus is no longer on presumed intent, but rather on party expectations since the intentions of the parties are usually expressed. The Restatement (Second) has adopted a modified traditional rule in usury cases and justifies its position through preservation of party expectation.[7]
A prime objective of both choice of law ... and of contract law is to protect the justified expectations of the parties. Subject only to rare exceptions, the parties will expect on entering a contract that the provisions of the contract will be binding upon them... . Usury is a field where this policy of validation is particularly apparent... . [T]he courts deem it more important to sustain the validity of a contract, and thus to protect the expectations of the parties, than to apply the usury law of any particular state.
Restatement (Second) of Conflict of Laws, § 203, Comment b (1971). Thus, the rule of validation is generally viewed as the best means of furthering the parties' expectations. A final justification for the traditional rule is founded in the idea of commercial comity. Since practically every jurisdiction that has confronted this issue has adopted some form of the traditional rule, this state would be commercially singular if it did not apply favorable law of the state with a normal relation to a contract. Commercial stability in interstate trade depends on predictability and some degree of uniformity among the states in their willingness to honor commercial agreements.
Federal courts in this state have followed the traditional rule, as stated in Fahs v. Martin, 224 F.2d 387, 397 (5th Cir.1955). In Your Construction Center, Inc. v. Dominion Mortgage & Realty Trust, 402 F. Supp. 757 (S.D.Fla. 1975), the district court applied New York law as contractually stipulated by the Florida corporate borrower and the New York lender, a Massachusetts business trust. Though relying partly on Thomson v. Kyle and the place of performance rule, the court also cited the language of Atlas Subsidiaries, 166 So.2d at 461, which laid out in dicta the general rule of validation in a usury situation. The rule of validation was effectively applied in a choice of lawusury case in Nicholas v. Publishers Collection Service, Inc., 320 F. Supp. 1200 (S.D.Fla. 1971), which again upheld party expectations.
The United States Fifth Circuit Court of Appeals has historically followed the rule of validation in usury cases. Lubbock Hotel Co. v. Guaranty Bank & Trust Co., 77 F.2d 152 (5th Cir.1935), held that when usury is *512 asserted, the law of the jurisdiction related to the transaction which upholds the contract is presumed to apply. Id. at 156. The influential case of Fahs v. Martin, which fully developed this choice of laws rule, followed Lubbock Hotel. Later, Blackford v. Commercial Credit Corp., 263 F.2d 97 (5th Cir.), cert. denied, 361 U.S. 825, 80 S.Ct. 74, 4 L.Ed.2d 69 (1959), stated simply, "[A]s to questions of usurious interests on a loan transaction having contact with many states, the law upholding the contract is to be controlling." Id. at 113.[8]
Support for the traditional rule in usury cases is found in the vast majority of other jurisdictions. See e.g., Speare v. Consolidated Assets Corp., 367 F.2d 208 (2d Cir.1966) (alternative holding, construing New York law); Cooper v. Cherokee Village Development Co., 236 Ark. 37, 364 S.W.2d 158 (1963); Ury v. Jewelers Acceptance Corp., 227 Cal. App.2d 11, 38 Cal. Rptr. 376 (1st Dist. 1964); Big Four Mills, Ltd. v. Commercial Credit Co., 307 Ky. 612, 211 S.W.2d 831 (1948); Ferdie Sievers & Lake Tahoe Land Co. v. Diversified Mortgage Investors, 603 P.2d 270 (Nev. 1979); and Goodwin Brothers Leasing, Inc. v. H & B Inc., 597 S.W.2d 303 (Tenn. 1980). In Ferdie Sievers, a Massachusetts business trust which transacted business throughout the country, with its principal place of business in Massachusetts, made a building construction loan to a Nevada corporation. The negotiations were carried on in Nevada, though the note was executed and made payable in Boston. The loan agreement stipulated Massachusetts law. Following Seeman, the Nevada Supreme Court upheld the agreement and refused to apply its own usury law since a "substantial nexus" with Massachusetts existed. Ferdie Sievers, 603 P.2d at 274.
Goodwin Brothers involved a slightly different situation: a forum borrower, a Tennessee construction corporation; and out of state lender, a Kentucky corporation; a contractual stipulation to Kentucky law; and a Tennessee office of the Kentucky lender where the loan was negotiated. The transaction was actually closed in the forum state and the proceeds disbursed there. In spite of the many Tennessee contacts, the Tennessee court applied Kentucky law, avoiding application of its own usury laws, and recognized principles of party autonomy based on Seeman. The only contacts with Kentucky were the domicile of the lender and the place of payment. But the court noted that Seeman had distilled the "good faith" requirement to mean "normal relation." Since the lender had its principal office in Kentucky, and it was this home office that approved the loan application, the court found a normal relation to Kentucky, and applied that state's laws. Goodwin Brothers, 597 S.W.2d at 308.
We do not have to decide as difficult a case as the Tennessee court dealt with in Goodwin Brothers, and intimate no views as to such a case. But we do decide that this Court will follow under the circumstances of this case the traditional rule, which upholds an agreement against usury by applying foreign law if the foreign jurisdiction has a normal relation to the transaction and would also favor the agreement. To this we add the clarification offered by Seeman that good faith of the parties is not relevant to a choice of laws question in the usury area unless no substantial or normal relation exists between the foreign jurisdiction and the transaction.

III. Application of the Rule
Here the parties did not stipulate to a jurisdiction having no normal relation to the transaction. On the contrary, several vital and natural elements exist which establish *513 a relationship with Massachusetts. The record shows that Continental's only domicile and office is in Boston. It is uncontested that Continental's principal place of business is Boston, and that in Boston the trust approves loans, handles all commercial banking arrangements, carries on relations with underwriters, and there pursues other means of raising funds for interstate loans. The record establishes that Continental was formed in 1961 in Boston, nine years prior to the Sailboat Key loan, for the legitimate business reasons of seeking special federal tax treatment as a real estate investment trust, utilizing the established and predictable business trust laws of Massachusetts. Massachusetts was the residence of the founding majority of trustees, and was the residence with the greatest number of trustees when the loan was made. In addition to the domicile-place of business contacts, which we consider most significant, the loan agreement was executed in Massachusetts, the loan was made payable in that state, and the funds were originally disbursed from that state.
It is patent from Seeman and its progeny that in a usury case that involves a conflicts question, we do not count the number of contacts with each state, or measure the good faith of the parties. Rather, we must look to the related foreign jurisdiction which favors the agreement, and determine if a normal relation exists. If a normal relation exists, we ought to apply the foreign law. In part for this reason, we are unimpressed with the lower court's and Sailboat Key's reliance on May v. United States Leasing Corp., 239 So.2d 73 (Fla. 4th DCA 1970), and Bella Isla Construction Corp. v. Trust Mortgage Corp., 347 So.2d 649 (Fla. 3d DCA 1977), for the proposition that choice of laws in the usury case is entirely a question of fact, i.e. good faith. Both of these cases simply require a factual hearing to support factual allegations made in pleadings of a usury case and hold that summary judgment is not proper without such a factual finding. Exhaustive fact finding has been conducted in the present case, making the direct holdings of May and Bella Isla inapplicable. We therefore need not determine what effect our decision today has upon these cases, but the implication based on these cases that good faith is required in addition to a normal relation is clearly refuted by our decision. See Consolidated Jewelers, Inc. v. Standard Financial Corp., 325 F.2d 31, 34 (6th Cir.1963).
The factually supported contacts Continental has with Massachusetts, particularly in its domicile and place of business, establish that it has a vital, natural, and normal relationship with that state, and therefore, in this usury case, the laws of Massachusetts should apply as contractually agreed by the parties. Although it is undisputed by the parties that applicable Massachusetts law does not provide usury penalties awarded to the borrower, we are not totally convinced that Massachusetts would not afford the borrower some relief. There is some possibility that Massachusetts Annotated Laws ch. 271, § 49 (1980), a criminal usury statute enacted in 1970, may be applicable. Recent Massachusetts cases, although upholding the loan agreement, have provided borrowers protected by the statute a modicum of relief by limiting interest collection to twenty percent.[9]See Begelfer v. Najarian, ___ Mass. ___, 409 N.E.2d 167 (1980); Beach Associates, Inc. v. Fauser, ___ Mass. App. ___, 401 N.E.2d 858 (1980). Since we were not briefed on Massachusetts law, and the parties did not present detailed arguments at either the trial or initial appellate level, we are unable to resolve this *514 issue. The present usury award to Sailboat Key cannot stand, however, since it was erroneously based on Florida law.
Accordingly, the petition for writ of certiorari is granted. The decision of the District Court of Appeal, Third District, is quashed, and this case is remanded to the district court with instructions to remand to the trial court for determination and application of Massachusetts law, the proceedings not to be inconsistent with our decision.
It is so ordered.
ADKINS, BOYD, OVERTON, ENGLAND and ALDERMAN, JJ., concur.
NOTES
[1] Jurisdiction vested under article V, section 3(b)(3), Florida Constitution (1972), because of the conflict with North Am. Mtg. Investors v. Cape San Blas Joint Venture, 357 So.2d 416 (Fla. 1st DCA 1977). This conflict issue was resolved by our decision in North Am. Mtg. Investors v. Cape San Blas Joint Venture, 378 So.2d 287 (Fla. 1979).
[2] This firm was referred to as Continental Advisors by the court below. 354 So.2d 67, 69-70 (Fla. 3d DCA 1977).
[3] Apparently, Mass. Ann. Laws ch. 107, § 3 (1975) is the applicable law. This section allows parties to contract for any interest rate so long as the agreement is in writing.
[4] See also Comment, Usury in the Conflict of Laws: The Doctrine of Lex Debitoris, 55 Cal.L. Rev. 123, 178 (1967).
[5] Notably, in Davis v. Ebsco Indus., Inc., 150 So.2d 460 (Fla. 3d DCA 1963), when faced with a choice of law situation involving a multistate contract containing a covenant-not-to-compete, the court applied New York law as chosen by the parties. The court would simply not enforce the contract in Florida. Neither party here seeks enforcement of any contractual rights. C & D Farms v. Cerniglia, 189 So.2d 384 (Fla. 3d DCA 1966), follows Davis.
[6] Under this traditional rule of Thomson, Massachusetts law would apply in the present case. The place of execution is Boston; the place of performance (payment) is also Boston. Thus, if we simply extended Goodman v. Olsen, 305 So.2d 753 (Fla. 1974), to this case, the result would be clear.
[7] Restatement (Second) of Conflict of Laws § 203 (1971) reads:

The validity of a contract will be sustained against the charge of usury if it provides for a rate of interest that is permissible in a state to which the contract has a substantial relationship and is not greatly in excess of the rate permitted by the general usury law of the state of the otherwise applicable law under the rule of § 188.
A state has a "substantial relationship" if it has a "normal and natural relationship to the contract and the parties." Id. § 203, comment c.
[8] We are not unaware of a recent fifth circuit case which did not follow this traditional rule, Woods-Tucker Leasing Corp. v. Hutcheson-Ingram Dev. Co., 626 F.2d 401 (5th Cir.1980). We do not find this case persuasive since that court felt bound to follow two Texas decisions of the 1890's which according to the court, developed an exception to the general rule. Ironically, the first case relied upon, Dugan v. Lewis, 79 Tex. 246, 14 S.W. 1024 (1891), upheld the parties' expectations by applying Texas law as contractually stipulated, which at the time validated the transaction. Woods-Tucker is the only case which explicitly adopts lex debitoris, the law of the debtor's domicile, as the conflict of laws rule in a usury case.
[9] The traditional rule derived from Seeman also applies the law of the more liberal jurisdiction if both have usury laws. Seeman itself applied the more liberal law since in that case even the lender's state, which was viewed as the parties' chosen law, had interest limitations, but with less severe penalties. Seeman, 274 U.S. at 405, 47 S.Ct. at 626. Thus, even if Massachusetts should have an applicable usury statute its law would still be the choice of law since its law is more lenient. See Fahs v. Martin, 224 F.2d 387, 397 (5th Cir.1955) (apply most favorable law); Wiltsek v. Anglo-Am. Properties, Inc., 277 F. Supp. 78 (S.D.N.Y. 1967); Deaton v. Vise, 186 Tenn. 364, 210 S.W.2d 665 (1948).