810 So.2d 958 (2002)
HORIZONS REHABILITATION, INC. etc., et al., Appellants,
v.
HEALTH CARE AND RETIREMENT CORPORATION, etc., Appellee.
No. 5D00-2414.
District Court of Appeal of Florida, Fifth District.
January 4, 2002.
Opinion on Grant of Rehearing March 15, 2002.
*960 John J. Sulik, of Dawson, Galant & Sulik, Jacksonville, and John M. Desmond, Mandeville, LA, for Appellants.
John A. DeVault III and R.H. Farnell, II of Bedell, Dittmar, DeVault, Pillans & Coxe, P.A., Jacksonville, and Kathleen H. McGuan and Tamara V. Scoville of Reed Smith LLP, Washington, DC, for Appellees.
SHARP, W., J.
Horizons Rehabilitation, Inc. (Horizons), et. al, appeals from a final summary judgment entered against it on all but one count of a fourteen-count first amended complaint. We affirm and remand to the trial court for further proceedings on Count XII, which was not dismissed in the summary judgment.
The facts of this case are not in dispute. In 1989, Ross Gault (Ross) formed Horizons, which provided holistic therapy services designed to help elderly disabled patients in nursing home facilities, one of which was Health Care & Retirement Corp. (Health Care).[1] Ross was the primary service provider, and it was he who had designed the program.
In 1992, Health Care agreed to lend Horizons $2 million dollars to expand its operations, and the parties entered into a series of contracts (the "agreements") which included, inter alia: a Credit Agreement, a Stock Purchase Agreement, a Sub-ordination Agreement, a series of therapy service contracts, and a Warrant Agreement. Later, a Forbearance Agreement was executed. These agreements were subject to one another. The Credit Agreement required Horizons, prior to closing the transaction, to fully disclose all material information concerning its business.
Pursuant to the agreements, Health Care paid $10,000 for a 10% equity interest in Horizons, and it received warrants to purchase an additional 39% of Horizons' stock. The transaction was structured in this way because Health Care's ownership of a therapy services provider who provided services in its own facilities implicated "related party" issues for Medicare purposes. However, if Horizons' business grew and a great majority of its contracts were with facilities not owned by Health Care, Health Care would then be able to exercise its warrants and own a greater percentage of Horizons.
The service contracts obligated Horizons to provide rehabilitation services at a number of nursing homes owned by Health Care. Horizons submitted monthly invoices to Health Care for these services and Health Care paid the invoices and received reimbursement from Medicare. The service contracts included termination provisions, whereby either party could cancel the contract without cause upon 30 to 90 day written notice.
Prior to executing the Letter of Intent with regard to the transaction, Horizons disclosed to Health Care on-going litigation between it, specifically Ross, and Paragon, a former nursing home in which Ross had provided therapy services. This litigation was commenced by Horizons' filing a declaratory action on a contract between Ross and Paragon. Paragon filed a counterclaim based on a non-compete *961 agreement in the contract. Approximately four months after the parties closed the transaction, Horizons forwarded pleadings in the litigation to Health Care.
Health Care reviewed the pleadings and determined that the litigation was substantially more serious than it had been led to believe. It had known only that the lawsuit was an attempt to recover money damages on unpaid invoices. However, the pleadings revealed that the litigation involved the claim that Horizons' therapy services activities were limited by a non-compete agreement, and that the service contracts entered into by the parties were in violation of the non-compete covenant.
The disclosure of the extent of this litigation resulted in the execution of the Forbearance Agreement, in which Health Care agreed to refrain from exercising any of its remedies under the Credit Agreement, and to continue to make loans to Horizons. This agreement also terminated Horizons' therapy services in locations where the non-compete agreement was in effect, and gave Health Care certain controls over Horizons' business.
Both the Credit Agreement and the Forbearance Agreement contained a choice of law provision which provided that all disputes arising out of the agreements would be "governed by and construed and enforced in accordance with the laws of the State of Ohio." The Forbearance Agreement also provided that Horizons "expressly acknowledges and agrees that [it had] no defenses, setoffs, claims, counter-claims or causes of action of any kind or nature" against Health Care.
In 1993, Horizons wanted to extend the Credit Agreement with Health Care. However, upon learning that Health Care wanted a 75% ownership/equity interest in Horizons, Horizons rejected that proposition and entered into a factoring arrangement. It also sought a purchaser or partner to merge with, and located TheraTx.
TheraTx presented several proposals for the purchase of Horizons which contemplated the continuation of services with Health Care. These services were governed by the service contracts, and under those agreements, Health Care had no obligation to modify the contracts and, in fact, could cancel them without cause upon 30 to 90 days written notice. TheraTx also wanted Health Care's attorney to provide a legal opinion that after the transaction was completed, there would be no conflict with federal or state law. Health Care's counsel refused to provide such an opinion because it feared there would be a conflict under the related party rule. Ultimately, TheraTx decided not to consummate the deal and withdrew its offer.
Also in 1993, the Department of Health and Human Services issued a memorandum which outlined inappropriate billing and payment practices for therapy services. As a result of this memorandum, Health Care increased its scrutiny of all invoices presented to it, including Horizons'. It discovered problems with Horizons' billing practices that were inconsistent with Health Care's policies and violated Medicare guidelines. This jeopardized Medicare's payment to Health Care of Horizons' invoices, both prospectively and retroactively. On March 31, 1994, Health Care gave notice that it was terminating all of its service contracts with Horizons.
During this same time, Horizons attempted to negotiate a management contract with Health Care for therapy services because it thought Health Care would need Horizons' management and therapists. In April of 1994, the parties met at Horizons' request. Health Care stated it wanted to review Horizons business operations, including billing information, accounting information, employee data, and asset data, and Horizons supplied *962 this information to it. On June 9, 1994, Health Care broke off negotiations with Horizons and informed Horizons that it intended to replace it. By June 30, 1994, all of the service contract terminations were effective and Horizons ceased doing business with Health Care.
Due to the potential liability Health Care faced if Medicare refused to pay Horizons' invoices, Health Care did not immediately pay Horizons' June invoices. Instead, it created a fund to indemnify itself, based on Horizons' obligation to indemnify Health Care if Medicare denied payment of any invoices. Over the following months, Health Care paid Horizons' invoices. By a letter dated August 25, 1994, Horizons accepted payment of $535,000, and the parties mutually released each other from all liability for claims arising from late payment of the invoices. The final amount was paid by Health Care on November 7, 1994.
Horizons then sued Health Care. Its first amended complaint consists of fourteen counts.[2] Health Care then moved for summary judgment, which the trial court granted on counts I through XI, XIII and XIV, leaving only count XII (action to set aside a stock purchase agreement) pending below.
In reviewing a summary judgment, every possible inference must be drawn from the record in a light most favorable to the nonmoving party, in this case Horizons. Greene v. Kolpac Builders, Inc., 549 So.2d 1150, 1151 (Fla. 3d DCA 1989). If there is any dispute as to the material facts summary judgment is precluded. Holl v. Talcott, 191 So.2d 40 (Fla.1966); Greene. The standard of review is de novo. Major League Baseball v. Morsani, 790 So.2d 1071 (Fla.2001); Rollins v. Alvarez, 792 So.2d 695 (Fla. 5th DCA 2001). The burden of establishing the absence of any material fact is on the moving party. Holl. Where there is no material fact in dispute and the court has applied the correct law, the summary judgment should be affirmed. See Strama v. Union Fidelity Life Ins. Co., 793 So.2d 1129 (Fla. 1st DCA 2001); Physicians Health Care Plans, Inc. v. Cook, 714 So.2d 566 (Fla. 1st DCA 1998), Evans v. Bell, 677 So.2d 306 (Fla. 1st DCA 1996). For the following reasons, we find there was no genuine issue of material fact in dispute, and that the trial court applied the correct law.
Horizons characterizes the release in this case as an anticipatory release, and argues that Florida law will not enforce anticipatory releases, i.e., releases for uncommitted intentional torts. In determining whether summary judgment was properly granted, we must first address whether and to what extent the choice of law and release provisions are valid under Florida law. We find the release is valid in Florida, although it would not bar claims for intentional torts.[3]
*963 The only claims in the complaint which pertain to intentional torts, are Counts VII (intentional interference with economic advantage); IX (fraud); and XIII (outrageous conduct). With respect to the remaining claims, the trial court determined that the plain meaning of the language in the release[4] barred the counts because Horizons released Health Care from any and all claims arising under contract, tort or any other theory of law. It also made various other alternative rulings which barred several of the counts. We agree that the release bars all of the claims which are not for intentional torts, based upon the language of the release.
Counts I, III and V involve breach of fiduciary duty and liability by shareholders. Counts II, IV and VI are identical except that they involve lender liability. These are not intentional torts. Count VIII for breach of duty of good faith and fair dealing, Count X for breach of contract, and Count XI for tortious breach of contract, are not intentional torts and are similarly barred by the releases. The court struck the punitive damages claim in Count XIV because it found that such claims are not permitted without prior trial court authorization, pursuant to § 768.72.[5]Mayer v. Frank, 659 So.2d 1254 (Fla. 4th DCA 1995). See also Sanchez v. Degoria, 733 So.2d 1103 (Fla. 4th DCA 1999); Kraft General Foods, Inc. v. Rosenblum, 635 So.2d 106 (Fla. 4th DCA 1994). We find no error with these rulings.
The trial court dismissed the three counts (VII, IX and XIII) involving intentional torts based on the release and Ohio law. But in addition, the court made other alternative holdings regarding the dismissal of these claims, and the dismissals were proper based on these holdings under Florida law. See Vandergriff v. Vandergriff, 456 So.2d 464 (Fla.1984); Carraway v. Armour & Co., 156 So.2d 494 (Fla.1963); Farrey's Wholesale Hardware Co., Inc. v. Hobesound Indus. Park, Inc., 719 So.2d 374 (Fla. 3d DCA 1998); Home Depot USA Co., Inc. v. Taylor, 676 So.2d 479 (Fla. 5th DCA 1996)(where trial court cites erroneous reason, cause should be affirmed where some other reason exists to support ruling).
The court found that Count VII, intentional interference with a prospective economic advantage, was barred because TheraTx withdrew its last proposal and at least two of the earlier proposals without any undue interference by Health Care. The proposals required Health Care to obtain a legal opinion that "the structure, *964 ownership and proposed business of Horizons after the transaction [would not] conflict with federal or state law." Health Care could not provide such an opinion since the structure of the new company contemplated by the proposal did raise potential related party issues. Further, the proposals required Health Care to commit to therapy contracts it was not required to undertake.
Under Florida law, a party is privileged to act, and his actions are non-actionable, if the actions are taken to safeguard or promote the party's own financial interests. Perez v. Rivero, 534 So.2d 914 (Fla. 3d DCA 1988); Knight Enterprises, Inc. v. Green, 509 So.2d 398 (Fla. 4th DCA 1987); Genet Company v. Annheuser-Busch, Inc., 498 So.2d 683 (Fla. 3d DCA 1986); Ethyl Corp. v. Baiter, 386 So.2d 1220, 1225 (Fla. 3d DCA 1980). Such conduct is privileged, and the actor is not liable for doing no more than insist upon existent legal rights in a permissive way, even though he is aware that such insistence may cause emotional distress. Southland Corp. v. Bartsch, 522 So.2d 1053 (Fla. 5th DCA 1988). In this case, Health Care's actions were privileged and a matter of legal right. It was under no obligation to enter into new service contracts, and it was unable to provide the legal opinion requested by TheraTx.
The court found that Count IX for fraud, failed as a matter of law, because the record was devoid of any evidence that Health Care told Horizons it would enter into any management contract with it.
Count XIII pertained to the intentional infliction of emotional distress, and the court found that it too failed as a matter of law. In order to state a cause of action for this tort, the plaintiff must prove that the wrongdoer's conduct was intentional or reckless; the conduct was outrageous; the conduct caused emotional distress; and the emotional distress was severe. Food Lion, Inc. v. Clifford, 629 So.2d 201 (Fla. 5th DCA 1993). The facts were not in dispute and as such were insufficient to meet the outrageous standard required in Count XIII. In this case, Health Care's "control" over Horizons' ability to declare bankruptcy and obtain financing was part of the Credit Agreement, and any actions taken pursuant to the agreement were within Health Care's legal rights.
AFFIRMED.
THOMPSON, C.J., and PLEUS, J., concur.

ON MOTION FOR REHEARING; REHEARING EN BANC AND CERTIFICATION
SHARP, W., J.
Horizons has filed motions for rehearing, rehearing en banc and certification. Health Care has filed a motion for rehearing. We grant Horizons' motion to rehear and add the following to the second paragraph on page 7 of the opinion, and divide it as follows:
Counts I, III and V involve breach of fiduciary duty and liability by shareholders. Counts II, IV and VI are identical except that they involve lender liability. These are not intentional torts. We note that one may file a claim for breach of fiduciary duty as either a negligent or an intentional tort. See Palafrugell Holdings, Inc. v. Cassel, 26 F.L.W. D201, ___ So.2d ___, 2001 WL 20824 (Fla. 3d DCA January 10, 2001); Daniel v. Coastal Bonded Title Co., 539 So.2d 567, 568 (Fla. 5th DCA 1989); Tunner v. Foss, 655 So.2d 1151, 1152 (Fla. 5th DCA 1995); Iden v. Kasden, 609 So.2d 54 (Fla. 5th DCA 1992). In this case, the breach of fiduciary claims were pled unspecified but the allegations were insufficient to rise to the level of an intentional tort. And the allegations failed to *965 establish the creation of a fiduciary relationship between the parties, in any event. Health Care had no fiduciary duty to Horizons as the parties were not in a fiduciary relationship, i.e., no trust was imposed or accepted by Health Care. Abele v. Sawyer, 747 So.2d 415 (Fla. 4th DCA 1999).[5]
Count VIII for breach of duty of good faith and fair dealing, Count X for breach of contract, and Count XI for tortuous breach of contract, are not intentional torts and are similarly barred by the releases. The court struck the punitive damages claim in Count XIV because it found that such claims are not permitted without prior trial court authorization, pursuant to § 768.72.[6]Mayer v. Frank, 659 So.2d 1254 (Fla. 4th DCA 1995). See also Sanchez v. Degoria, 733 So.2d 1103 (Fla. 4th DCA 1999); Kraft General Foods, Inc. v. Rosenblum, 635 So.2d 106 (Fla. 4th DCA 1994). We find no error with these rulings.
In all other respects, the motions of both parties are DENIED.
THOMPSON, C.J., and PLEUS, J., concur.
NOTES
[1] For purposes of this appeal, "Health Care" includes Health Care and Retirement Corporation, and Health Care Retirement Financial Company.
[2] Those counts are as follows: Breach of Fiduciary Duty-Shareholder (Count I); Breach of Fiduciary Duty-Lender (Count II); Shareholder Liability (Counts III and V); Lender Liability (Counts IV and VI); Intentional Interference With Prospective Economic Advantage (Count VII); Breach of Duty of Good Faith and Fair Dealing (Count VIII); Fraud (Court IX); Breach of Contract (Count X); Tortious Breach of Contract (Count XI); Action to Set Aside Stock Purchase Agreement (Count XII); Outrageous Conduct (Count XIII); and Punitive Damages (Count XIV).
[3] However, under either Florida or Ohio law, the result of the release would be the same as to those claims covered by it. Choice of law provisions are enforceable in Florida unless they violate public policy. Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co., 761 So.2d 306 (Fla.2000); Continental Mortgage Investors v. Sailboat Key, Inc., 395 So.2d 507 (Fla.1981); Dept. of Motor Vehicles v. Mercedes-Benz of N.A., Inc., 408 So.2d 627, 629 (Fla. 2d DCA 1981). Florida courts will not enforce releases of intentional torts, as they violate public policy. Oceanic Villas, Inc. v. Godson, 148 Fla. 454, 4 So.2d 689 (1941); Mankap Enter., Inc. v. Wells Fargo Alarm Services, 427 So.2d 332, 333-34 (Fla. 3d DCA 1983); Zuckerman-Vernon Corp. v. Rosen, 361 So.2d 804 (Fla. 4th DCA 1978).
[4] No Waiver Release. [E]ach of the Loan Parties [the Borrowers] hereby expressly acknowledges and agrees that the Loan Parties, individually and collectively, have no defense, setoffs, claims, counterclaims or causes of action of any kind or nature whatsoever against the Lender or any of the other Indemnified Parties that directly or indirectly arise out of, or are based upon, or in any manner related to, the matters referred to herein or therein; and each of the Loan Parties, individually and collectively, hereby expressly waives, releases and relinquishes any and all of such defenses, setoffs, claims, counterclaims and causes of action.
[5] That section provides, in part:

(1) In any civil action, no claim for punitive damages shall be permitted unless there is a reasonable showing by the evidence in the record or proffered by the claimant which would provide a reasonable basis for recovery of such damages. The claimant may move to amend her or his complaint to assert a claim for punitive damages as allowed by the rules of civil procedure....
[5] The claims as pled and argued are that Health Care violated an implied duty of good faith and fair dealing in its management contract negotiations with Horizons. But the record shows that the parties were negotiating a potential management contract. Thus, no fiduciary duty arose because the parties never reached an agreement or executed an enforceable contract. Cavallaro v. Stratford Homes, Inc., 784 So.2d 619 (Fla. 5th DCA 2001).
[6] That section provides, in part:

(1) In any civil action, no claim for punitive damages shall be permitted unless there is a reasonable showing by the evidence in the record or proffered by the claimant which would provide a reasonable basis for recovery of such damages. The claimant may move to amend her or his complaint to assert a claim for punitive damages as allowed by the rules of civil procedure....