472 So.2d 1360 (1985)
Virginia W. REBMAN, Appellant,
v.
FLAGSHIP FIRST NATIONAL BANK OF HIGHLANDS COUNTY, f/k/a First National Bank of Sebring, Appellee.
No. 84-1603.
District Court of Appeal of Florida, Second District.
July 26, 1985.
*1361 John F. Howard, Sebring, for appellant.
Clifford M. Ables, III, Sebring, for appellee.
DANAHY, Judge.
This is an appeal from a summary judgment of mortgage foreclosure. The only issue involves usury. We affirm the judgment and the finding of the trial judge that the mortgagee bank did not charge the mortgagor, Virginia W. Rebman, a usurious rate of interest.
The mortgage secured three loans evidenced by three promissory notes which were made at different times. The first note was for one year in the principal amount of $21,000 and carried an interest rate of 14% per annum. The second note, executed a year later, was for a term of one year, in the principal amount of $30,000 with interest at the rate of 15 1/2% per annum. The proceeds of that note paid off the balance of the first note and the remaining $5,662.47 was deposited in the bank in a non-interest-bearing account entitled "Virginia W. Rebman Escrow Account, Mike Willingham."[1] According to Rebman's affidavit, she signed no signature card and was not allowed to make withdrawals from this account because "the funds were there for the purpose of paying payments on the mortgage." Bank records show that the only transactions involving this account were monthly withdrawals equal to Rebman's $430.19 monthly mortgage payment of principal and interest. These account transactions continued until the funds were depleted, approximately one year later. At about the same time, Rebman executed the third promissory note for $29,360 with interest at the rate of 17% per annum. A handwritten notation on the bottom of the second note indicates that the third note was a renewal of the second note. Each of the three notes contained the following clause:
In no event shall the interest charged hereunder be in excess of the legal maximum rate of interest (if any) allowed by applicable law as the law now exists or as the law may be changed in the future to allow higher rates of interest, and in the event that interest is charged at a rate in excess of the maximum rate allowed, any excess sums collected by the Bank shall be applied as a reduction to principal, it being the intent of the Maker hereof and the Bank that the Maker pay no more and the Bank collect no more than the sums allowed using a lawful rate of interest.
Two months later Rebman executed yet another promissory note, which was unsecured, for $2,762.40 with an interest rate of 15% per annum. That sum was deposited in the bank in a new non-interest-bearing account entitled "Virginia W. Rebman Escrow, give to Mike Willingham." Contrary *1362 to Rebman's affidavit which alleges that she signed no signature card and had no access to this account for use of the funds, the affidavit of the bank vice president contains a signature card signed by Rebman whereby she authorizes the bank to debit this account in order to make her payments on the third note secured by the mortgage. According to bank records, the funds were used to pay monthly mortgage payments of principal and interest until the funds were depleted. Additionally, bank records indicate another deposit was made to this account.
Rebman contends that since she did not have use of the funds in the escrow account, those funds should be treated as an "advance" or "forbearance" in computing the effective rate of interest under Florida's general usury law, chapter 687, Florida Statutes (1983). The bank argues that there is no evidence that the opening or maintenance of the account was a requirement of the bank. The trial court rejected Rebman's contention and in doing so stated:
By placing a portion of the principal amount in escrow to assure timely repayment, the bank placed itself in the position of escrow agent for the defendant vis-a-vis the escrowed money. Since the bank did not retain an ownership interest in the money and could use it only to make the monthly loan payments, the principal amount was not thereby reduced. A usurious interest rate was not charged.
We agree with the trial court and begin our discussion by noting the four requirements necessary to establish a usurious transaction. They are:
1. A loan, either express or implied.
2. An understanding between the lender and the borrower that the money must be repaid.
3. For such loan a greater rate of interest than is allowed by law shall be paid or agreed to be paid.
4. There must be a corrupt intent on the part of the lender to take more than the legal rate of interest for the use of the money loaned.
Dixon v. Sharp, 276 So.2d 817 (Fla. 1973); Clark v. Grey, 101 Fla. 1058, 132 So. 832 (1931); Stewart v. Nangle, 103 So.2d 649 (Fla. 2d DCA 1958). The burden to establish these elements of usury is on the borrower. Dixon; Swanson v. Gulf West International Corp., 429 So.2d 817 (Fla. 2d DCA 1983).
While we agree that Rebman did prove the first and second requirements, she did not prove the third and fourth. Looking first at the third element, section 687.03(1) defines unlawful rates of interest as:
Except as provided herein, it shall be usury and unlawful for any person, or for any agent, officer, or other representative of any person, to reserve, charge, or take for any loan, advance of money, line of credit, forbearance to enforce the collection of any sum of money, or other obligation a rate of interest greater than the equivalent of 18 percent per annum simple interest, either directly or indirectly, by way of commission for advances, discounts, or exchange, or by any contract, contrivance, or device whatever whereby the debtor is required or obligated to pay a sum of money greater than the actual principal sum received, together with interest at the rate of the equivalent of 18 percent per annum simple interest.
This section thus requires interest to be calculated upon the "actual principal sum received." Florida courts have defined that term to mean the actual money distributed by the lender to the borrower at the time of closing. See Mindlin v. Davis, 74 So.2d 789 (Fla. 1954); Wilson v. Conner, 106 Fla. 6, 142 So. 606 (1932). In this regard, Rebman asks this court to treat the escrowed monies as a forbearance in the form of an interest reserve or alternatively as a compensating balance account. She therefore argues that the effective rate of interest should be computed according to the "spreading" formula set forth in section 687.03(3), Florida Statutes (1983), and *1363 approved in St. Petersburg Bank & Trust Co. v. Hamm, 414 So.2d 1071 (Fla. 1982).
A court should seek substance over form when it analyzes the amount of "actual principal sum received" for purposes of usury calculations. See Mindlin. Accordingly, any amounts advanced by a lender which directly or indirectly benefit the borrower  as well as any amounts directly received by a borrower  should be a part of the principal used for calculating interest under our usury law. That being so, although the escrowed monies never passed through Rebman's hands, they were used exclusively to benefit her in the payment of her monthly principal and interest obligation. Consequently, we find appellant's argument that the escrow accounts were in fact compensating balance or interest reserve accounts established for the bank's benefit is without merit. In its simplest form, a compensating balance is an amount a lender contractually requires a borrower to leave on deposit during the term of the loan; an interest reserve account is an express contractual designation of a portion of the loan to be used to pay interest that will accrue on that loan. These two practices are discussed in Practice Under Florida Usury Law, sections 4.33 and 4.34 at 114 through 116 (Florida Bar Continuing Legal Education Practice Manual, 1982).[2]
*1364 In the case before us, the loan documents in evidence contain no bank requirement that either the operation or maintenance of the escrow account was a condition of the loan, and in her affidavit Rebman never stated that it was. Further, the bank records revealed that the deposited funds did not remain in either escrow account during the entire loan period but instead were used to pay monthly interest and principal on Rebman's obligation until these funds were depleted. This evidence is not refuted by Rebman's affidavit. Consequently, there are no facts to be found, nor inferences which remain, after the findings by the trial judge here that the escrow account was merely encouraged by the bank and that the escrow account was established as a convenience for Rebman. Additionally, it is not disputed that Rebman authorized the bank to make withdrawals from the subsequent escrow account, that she executed additional notes to obtain funds to make the accrued payments on the third note, that she made a subsequent deposit to one of the escrow accounts, and that the stated interest rate on the face of each note was within the legal limit. Therefore, there is no indication that the principal balance was or should be reduced by the amounts placed in the escrow accounts. The only conclusion to be reached in this case is that a greater rate of interest than is allowed by law was neither paid nor agreed to be paid.
Turning to the fourth necessary element, corrupt intent, we note that the statute imposes a penalty only on those lenders who "willfully" violate it. § 687.04, Fla. Stat. (1983). Generally, the question of intent is one of fact. However, in this particular instance where there is no conflict in material facts, that question is one of law for the court. See Johnson v. Gulf Life Insurance Co., 429 So.2d 744 (Fla. 3d DCA 1983). The circumstances surrounding the entire transaction, together with the stated interest rate and the disclaimer clause found on the face of each note, conclusively show that the bank did not willfully or knowingly charge or accept excessive interest in connection with the loan. Moreover, Rebman made neither an allegation nor a showing that the bank had a purposeful intent to violate the law, as was her burden. Therefore we think the trial judge was correct in his finding that the loan is not usurious and that Rebman is not entitled to cancellation of her obligation. For these reasons, we affirm the summary judgment entered by the trial judge in favor of the bank.
BOARDMAN, EDWARD F., (Ret.) J., concurs.
GRIMES, A.C.J., dissents with opinion.
GRIMES, Acting Chief Judge, dissenting.
My quarrel with the majority opinion is that it overlooks the fact that this case was decided on summary judgment.
According to 45 Am.Jur.2d Interest and Usury § 113 (1969):
If as a condition of making a loan the borrower is required to leave part of the money on deposit with the lender, the transaction is usurious if the interest paid for the loan amounts to more than legal interest on the sum actually available for the use of the borrower.
As stated in the annotation at 92 A.L.R.3d 769, 774 (1979), entitled "Leaving Part of Loan on Deposit With Lender as Usury":
It is generally recognized that if as a condition of making a loan, the borrower is required to leave part of the money on deposit with the lender, the transaction is usurious where the interest paid for the loan amounts to more than the legal interest on the balance left in the borrower's hands for his actual use.
*1365 For a case involving the application of this rule under Florida law, see American Acceptance Corp. v. Schoenthaler, 391 F.2d 64 (5th Cir.1968), cert. denied, 392 U.S. 928, 88 S.Ct. 2287, 20 L.Ed.2d 1387 (1968).
Significantly, in its brief the bank conceded that if the funds in the escrow account were considered as being taken as an advance or forbearance, the effective rate of interest computed according to the formula proved in St. Petersburg Bank & Trust Co. v. Hamm, 414 So.2d 1071 (Fla. 1982), would approximate 23%.[3] Therefore, the pivotal question is whether the bank required the establishment of the escrow account as a condition of the loan.
I find it difficult to believe that Rebman would voluntarily place a portion of the loan proceeds in a non-interest bearing account controlled entirely by the bank if she were not required to do so in order to obtain the loan. In any event, the bank presented no evidence that the opening of the escrow account was not a condition of the loan, and for purposes of summary judgment, the burden of proof was on the bank.
Moreover, if the effective rate of interest was usurious, I cannot see how it can be said on summary judgment that there was no corrupt intent. It may be that the corrupt intent required for usury would be negated by the clause appearing in each note which provides that interest shall not exceed the maximum allowable rate of interest and that any excess shall be applied to the reduction of principal. However, this issue has not yet been argued by either side and disclaimer clauses such as this have not always been effective to preclude a finding of usury. See Oklahoma Preferred Finance & Loan Corp. v. Morrow, 497 P.2d 221 (Okla. 1972); Practice Under Florida Usury Law § 1.21 (Fla.Bar Continuing Legal Educ.Practice Manual, 1982).
I would reverse and remand for further proceedings in which these issues could be fully explored.
NOTES
[1] Mike Willingham was a bank officer.
[2] D. [§ 4.33] Compensating Balances

In its purest form a compensating balance is an amount a lender requires a borrower to leave on deposit during the term of a loan. For example, a bank making a $500,000 working capital loan to a company may require as a condition to the loan that the company maintain a demand deposit account with a balance of at least 20% ($100,000) of the principal amount of the loan with the bank. The bank normally would not pay any interest to the borrower on the $100,000, the "compensating balance." It is apparent that, although the lender may have directly delivered $500,000 to the borrower, the borrower only obtains the benefit of $400,000. The principal balance used to calculate the rate of interest under Florida usury laws, therefore, would be limited to the $400,000 amount benefiting the borrower.
Not all compensating balances maintained by a borrower with a lender should be treated as reducing the principal amount of the loan outstanding. The key element in the analysis is not merely whether the borrower keeps a deposit with the lender but whether the maintenance of that balance is contractually required in the loan arrangement between the lender and the borrower. Appleton Bank v. Fiske, 91 Mass. (8 Allen) 201 (1864). Banks, accordingly, often encourage a borrower to keep amounts on deposit with the bank, and in determining a rate of interest to be charged to on a new loan, the banks may consider the average balance kept by the borrower. The amount of those balances, however, will not be deducted from the principal of any loan for purposes of a usury analysis if there was no actual requirement that certain minimum balances be maintained with the lender as a condition of the loan.
E. [§ 4.34] Interest Reserves
An interest reserve, essentially, is a designation of a portion of the amount of a loan to be used to pay interest that will accrue on that loan. For example, in a typical real estate construction loan a lender recognizes that the borrower does not have the funds to pay interest on the loan during construction and expects the interest to be repaid from the proceeds of a permanent mortgage loan obtained after construction is complete or from revenues generated by the sale or operation of the project after completion of construction. Construction frequently is not completed for several years and lenders for purposes of their own financial accounting want to obtain interest during that period even though the borrower does not have the funds to pay that interest. Thus, the expediency has been developed by which the lender loans additional sums to the borrower from time to time to permit that borrower to pay interest to the lender. As the technique has been refined, the amount required for interest is built into the construction loan at the outset. For example, in a $1,000,000 construction project contemplated to take one year to build, a lender might determine that the probable interest that would accrue during the year would be $50,000. The lender then would agree to lend the borrower $1,050,000, permitting the borrower to draw on up to $1,000,000 of that amount for payment of construction costs and up to $50,000 of that amount to repay monthly interest charged by the lender.
No judicial decisions were discovered that deal directly with this point. Borrowers, however, in usury cases, have argued that the amount of the interest reserve should be deducted from the principal outstanding for purposes of making usury calculations because the lender never really disbursed the interest but retained the interest for itself much as is true in a discount loan situation. Although the result argued for in those cases may be correct, it is suggested that the reasoning behind the argument is inappropriate. In fact, the borrower does obtain benefit from periodic disbursements from the interest reserve. The principal balance, therefore, should not be reduced by the amount advanced from the interest reserve. It is possible, however, that a similar result would be reached under Florida's compounding rules that are discussed more thoroughly in § 4.50.
[3] The bank may have conceded more than necessary because monies in the account were used to meet the interest payments under the loan as they became due. Therefore, even if the escrow account was a condition of the loan, the bank could logically argue that in computing the effective rate of interest, consideration should be given to the fact that appellant was only deprived of the use of the escrow funds until they were applied to meet her interest payments on the loan. This record contains no such computations.