PER CURIAM.
This is an appeal from an order denying a secured proof of claim filed by First American Bank and Trust in an insurance receivership proceeding initiated by the Florida Department of Insurance against International Medical Centers, Inc.[1] We reverse, holding that the court erred in ruling that First American’s loan to IMC was criminally usurious, and thus unenforceable.
First American’s proof of claim seeks payment of $18,632,787.19, plus costs, attorneys’ fees, and interest. The claim is based on several loan transactions between First American and IMC aggregating approximately $15,000,000. These transactions were quite complex and the lengthy loan agreements giving rise to these claims resulted from extensive negotiations. The loan agreements contain various provisions for security to insure IMC’s repayment obligation. More specifically, IMC, its subsidiaries and affiliated entities entered into a series of five transactions with First American involving two separate closings in June and July 1985. The final order appropriately described these loans and the underlying transactions in the following four categories.
First, there is $10 million in secured loans made by First American to Miami General Hospital, of which IMC is the parent corporation.[2] These loans were collat-eralized by a security interest in all of IMC’s tangible and intangible personalty. As did the court below, we shall refer to these transactions simply as “Loans.”
Second, there is the Pembroke Pines loan pursuant to an agreement by First American with Cenvill Development Corporation for the purpose of financing the construction and opening of an HMO clinic in a retirement community under development by Cenvill. This agreement required the formation of a limited partnership to operate the clinic, giving an entity affiliated with First American a 25 percent ownership interest as a limited partner, and requiring the partnership to lease the clinic site at market rates from another of First American’s affiliates. In addition, the partnership was required to pay the limited partner $1,000 for each HMO member recruited at the clinic. This transaction is referred to simply as “Pembroke Pines.”
Third, there is the “Lease Facility” agreement by which First American’s subsidiary, First American Leasing Corp., agreed to exercise its best efforts to broker $4.4 million in equipment leases for IMC, as lessee.
Fourth, at the loan closing, IMC transferred to First American preferred stock in IMC having a par value of $3.75 million, together with a repurchase agreement by which IMC was required, at First American’s election, to repurchase this stock from First American after two years or the occurrence of certain other events, at $3.75 million. This repurchase agreement was also secured by a pledge of all IMC’s personal property.[3]
*1371 After IMC was placed in receivership by the Department of Insurance, First American timely filed its proof of claim now under review. The Department, as receiver, objected to the claim on grounds that, among others, the loans described above were usurious and unenforceable under the provisions of sections 687.03 and 687.071, Florida Statutes (1987). After an eviden-tiary hearing, the court below sustained the secured proof of claim as to the $4,866,-678.54 claimed in connection with a construction loan for a medical office building and the real estate on which it is located. The court disallowed all other claims as being unenforceable against IMC. The court made the following findings of fact, among others:
8. Notwithstanding statements to the contrary contained in the closing documents reflecting the Five Transactions,[4] the Preferred Stock was transferred by IMC to [First American] as consideration for the Loans, which consideration was in addition to interest reserved in the promissory notes reflecting the Loans. Neither [First American], IMC, nor any of their affiliated entities or subsidiaries intended the Preferred Stock to be anything other than consideration for the Loans.
9. The Pembroke Pines transaction and the Option were not intended by [First American], IMC, or any of their affiliated entities or subsidiaries to have been in exchange or consideration for the Preferred Stock, in whole or in part. The Pembroke Pines transactions and the Option were supported by adequate, fair consideration, independent of the Preferred Stock. The closing documents reflecting the Five Transactions contain statements to the contrary solely to disguise and conceal the usurious nature of the Loans.
10. The Lease Facility was merely a best efforts brokerage. Neither [First American] nor any of its affiliated entities or subsidiaries ever intended, expected or actually did act as a lessor or extend credit or money in connection with the Lease Facility. All parties intended the equipment leases entered into pursuant to the Lease Facility to be true commercial leases and the Court finds that they were in fact true commercial leases and not loans, advances of money, lines of credit or financing arrangements. All such leases contain purchase options for fair market value upon expiration of the lease term, which value would have been more than a nominal payment. The Lease Facility was supported by fair and adequate consideration entirely independent of the Preferred Stock and the parties in no way intended that the Preferred Stock, in whole or in part, be consideration for the Lease Facility.
11. The Preferred Stock constituted and was intended by all parties to be interest on the Loans and nothing more.
12. During June and July of 1985, the time during which the Preferred Stock was transferred by IMC to [First American], the Preferred Stock had a value of at least $3.75 million for the reasons explained in the testimony of the Receiver’s expert, Stanley Cohen, which testimony was unrebutted by [First American]. The value of the Preferred Stock need not be reduced to “present value” for purposes of calculating an effective interest rate under Chapter 687, Florida Statutes, also for the reasons explained in Stanley Cohen’s unrebutted testimony.
13. Spreading the value of the Preferred Stock as interest over the life of the Loans, as required by Chapter 687, Florida Statutes, results in an effective interest rate charged IMC by [First American] of in excess of 25.8%. In addition, the alleged “commitment fee” of $175,000 paid by IMC to [First American] in connection with the Loans was intended by all parties to be and, in fact, was prepaid interest and, therefore, must also be spread over the life of the Loans, *1372 which results in an effective interest rate in excess of $26.5% (sic).
14. [First American] loaned $10 million to IMC and its subsidiaries and affiliated entities knowingly, willfully and with the specific intention of charging, taking and reserving interest in excess of 25% per annum, but not in excess of 45% per annum. As a result, the Loans constituted criminal usury. [First American] attempted to disguise and conceal the criminally usurious nature of the Loans by falsely representing the nature and purpose of the Preferred Stock in the closing documents.
15. Neither IMC nor any of its agents, employees or representatives made any statement to [First American] or its agents, employees or representatives that the Loans or any other transactions in which IMC and [First American] were involved were not usurious. Assuming, arguendo, such statements were made, [First American] was not justified in relying on those statements and, in fact, did not rely on any such statements.
16. Neither IMC nor the Receiver ever waived the defense of usury and the Receiver is not estopped to assert usury.
(R. 1369-71). After making further findings of fact regarding the credibility of certain witnesses, the court recited the following conclusions of law relevant to this appeal:
3. [First American] loaned and extended credit to IMC in the amount of $10 million, for which Loans [First American] knowingly, willfully and with specific intent to commit criminal usury, charged, took and reserved interest in excess of 25%, but not in excess of 45% per annum, which resulted in criminal usury in violation of Section 687.071(2), Florida Statutes.
4. All obligations, requirements and duties incurred by IMC in connection with the Loans and the Preferred Stock are unenforceable against IMC under the laws of Florida, including but not limited to Section 687.071(7), Florida Statutes.
(R. 1371-72). The court also ruled, alternatively, that “even if the obligations, requirements and duties created by the Preferred Stock were not unenforceable due to usury, the $4.29 million repurchase obligation ... is unenforceable under Section 607.017(4), Florida Statutes.” The court further ruled that, even if the repurchase obligation were enforceable, “the $4.29 million claim would be limited to a class 8 priority, pursuant to Section 631.271(l)(h), Florida Statutes, as the ‘claim of a shareholder’.” (R. 1372).
First American raises two broad points on this appeal. It first contends that for several reasons the court erred in finding the loan criminally usurious. We address only one of these reasons. Second, it contends the court erred in denying the claim security status on the alternative grounds set forth above.
The court below erred in finding the Loans criminally usurious and unenforceable under section 687.071 because it attributed a value of $3.75 million to the preferred stock transaction based on IMC’s obligation to repurchase the stock for that amount after two years without reducing the value attributable to that repurchase agreement to present value. The trial court treated the $3.75 million repurchase agreement as a fee that must be included in the total interest calculation. In so doing, the court necessarily disregarded the fact that the preferred stock issued to First American contained restrictions that precluded its sale to anyone for two years, and also disregarded the terms of the agreement definitively providing that the repurchase amount would not be payable by IMC to First American until after two years had passed. Because of these restrictions, First American could not sell the stock to IMC or anyone else for two years, and it is perfectly clear that the preferred stock had a market value to First American of $3.75 million dollars two years hence, irrespective of the recited par value when issued. For purposes of deciding this appeal, therefore, it is appropriate to treat this preferred stock transaction as though IMC agreed to pay First American an additional fee for interest totalling $3.75 million two *1373 years after the closing of the loans and receipt of the loan principal by IMC.
It is elementary that money has a value that necessarily relates to the time of its possession and use. It is upon this fundamental principle that courts routinely instruct juries that amounts allowed as “damages for [future pecuniary losses] should be reduced to their present money value and only the present money value of such amounts should be included in your verdict.” Fla.Std.Civ.Jury Inst. No. 6.10. This is so because payment of the full amount of damages before the loss is incurred gives the recipient premature use of the funds. Similarly, in determining whether a particular loan is usurious, a significant delay in advancing the proceeds of a loan to a borrower without a corresponding abatement of interest on the funds to be so advanced will materially increase the amount of real interest on that loan because “ ‘time as well as amount of principal is a factor in the calculation of interest.’ ” Williamson v. Clark, 120 So.2d 637, 639 (Fla. 2d DCA 1960). Likewise, where one promises to pay a sum certain two years hence, that sum certain must be reduced to present value to determine its market value to the payee at the time the promise is given because the payee is deprived of the use of the funds during the period that payment is deferred. Simply stated, the sum to be paid must be discounted in value due to the delay in payment.
Section 687.03(3), Florida Statutes (1987), specifically provides that for purposes of that chapter the rate of interest on the loan in question “shall be determined and computed upon the assumption that the debt will be paid according to agreed terms” and that “any payment or property charged, reserved, or taken as an advance or forbearance, which is in the nature of, and taken into account in the calculation of, interest shall be valued as of the date received and shall be spread over the stated term of the loan....” Pursuant to these provisions (assuming without deciding that it was appropriate for the trial court to treat the preferred stock repurchase agreement as interest), the value of that transaction must be determined as of the date of receipt of the stock at closing. Irrespective of the announced par value of this stock issue and the recorded value on IMC’s financial books as issuing corporation, the value of this transaction that is critical to the issue on this appeal is necessarily the value of this stock to First American at closing after giving full effect to the agreed restrictions on sale and repurchase that prevent its conversion to money for at least two years.
It is undisputed on the record that if the $3.75 million preferred stock transaction is reduced to present value at the time of closing, the total interest on the loan transactions will not exceed the 25 percent statutory maximum and the loan will not be criminally usurious. The receiver’s expert, Stanley Cohen, agreed that this is so.
The reasons advanced by Mr. Cohen and accepted by the trial court for not reducing the stock transaction to present value are not inconsistent with the above discussion. Mr. Cohen was tendered as a witness having no personal knowledge of the facts in this case and was asked only to express hypothetical opinions. Mr. Cohen, as did the court below, disregarded the obvious legal and economic effect of the restrictions on the sale and repurchase of the preferred stock, and based his hypothetical valuation on the par value of the stock because the law requires stock to have a value at least equal to its par value when issued, and because the repurchase agreement was secured by a pledge of all of IMC’s personalty.[5] This testimony, however, does not validly establish a finding as to the market value of the preferred stock transaction to First American at the loan closing. Even though IMC may well have been able to demonstrate that the preferred stock had a value equal at least to its par value should the corporation be dissolved, and that its recited par value was fully secured by the pledge of IMC’s personalty, this approach to valuation disregards the mandate of section 687.03 that *1374 valuation be determined “upon the assumption that the debt would be' paid according to the agreed terms.” This requirement applies just as much in determining the value of an agreement for the future payment of interest by the borrower to the lender as it does to the agreement for repayment of the principal loan to the lender. Therefore, we are compelled to conclude that First American did not receive $3.75 million in value at closing in respect to the restricted preferred stock transaction; it only received stock certificates that could be sold or redeemed two years hence for $3.75 million, a figure that had to be discounted at closing to value substantially less than $3.75 million. This construction of the statute and the application thereof to these facts is given even greater significance by the fact that in May 1987, less than two years after the closing of the preferred stock transaction, IMC was declared bankrupt and could not perform its agreement to repurchase.
The trial court’s ruling that the subject loans were criminally usurious was erroneous for the reasons stated above, so we find it unnecessary to address any of appellant’s remaining grounds of error regarding the finding of usury. We do note that provisions in loan documents limiting the amount of interest payable to that authorized under applicable law have been recognized as valid and enforceable in this state and provide a complete defense to a charge of usury. E.g., Forest Creek Development Co. v. Liberty Savings & Loan Assoc., 531 So.2d 356 (Fla. 5th DCA 1988), rev. denied 541 So.2d 1172 (Fla.1989). In a case such as this, where the effective interest rate found to be usurious is so near the allowable maximum depending on disputed legal principles of valuation, a strong showing indeed must be made to invalidate such provisions in the loan documents in this case. We do not, however, find it necessary to review the sufficiency of the record to support the trial court’s adverse ruling on this issue.
Having determined that the loan transactions are not usurious under sections 687.-03 and 687.071 and thus not unenforceable under the provisions of that chapter, we now look to the trial court’s alternative grounds for its rulings. The first alternative ground was that the preferred stock repurchase obligation is unenforceable under section 607.017(4), Florida Statutes (1987).[6] First American disavows that its proof of claim attempts to enforce the stock repurchase agreement by compelling the now bankrupt IMC to repurchase the preferred stock at the agreed price. It necessarily must take that position, and there does not seem to be any disagreement that this section of the statute precludes enforcement of the agreement to repurchase. Rather, First American contends that regardless of the unenforceability of the repurchase agreement, it nevertheless retains perfected lien rights in the property of IMC pledged as security for the loan transaction of which the preferred stock agreement was but a part, and that it seeks to enforce its liens independently of the enforcement of the repurchase agreement. The appealed order did not address this precise issue. Thus, we remand for further consideration of appellant’s proof of claim to enforce its perfected lien interest in light of our ruling on the issue of criminal usury. We express no opinion on the validity of the claimed liens.
Last, the trial court says that “even if the repurchase obligation were enforceable, the $4.29 million claim would be limited to a class 8 priority, pursuant to Section 631.271(l)(h), Florida Statutes, as the ‘claim of a shareholder.’ ” Once again, this finding relates to the enforceability of the agreement to repurchase the stock and First American’s unsecured interest in IMC as a preferred stockholder. The trial court’s ruling does not address First American’s claim to perfected lien interests in the assets of IMC that may be enforceable independent of First American’s interest as a preferred stockholder and the stock repurchase agreement. Thus, as with the previous alternative ruling, we remand for *1375 further proceedings with respect to the enforceability of First American’s claim as a secured creditor. We express no opinion on the priority of First American’s claims vis-a-vis any other creditors of IMC.
The appealed order is reversed in part and the cause is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
SMITH, ZEHMER and BARFIELD, JJ., concur.

. The Florida Department of Insurance, acting as receiver for IMC, is the appellee representing IMC’s interest.

. As did the court and parties below, we treat these loans as being made to IMC, because IMC was the parent corporation through which all management was accomplished, a substantial portion of the proceeds of this loan went directly to IMC, and IMC guaranteed repayment of this loan.

.There was also a construction loan transaction involving a debt of $4,866,678.54 due to First American that was not disputed below and is not involved in this appeal.

. Each of the agreements contained a provision expressly limiting the maximum interest payable under the agreement to the maximum rate of interest allowed by applicable law, and required any payments in excess of that amount to be credited as a payment of principal or returned to the debtor.

. This same personalty was also pledged as security for the Loans.

. Section 607.017(4) precludes a corporation from purchasing or paying for its own shares when the corporation is insolvent or such payment would make it insolvent.