639 So.2d 664 (1994)
JERSEY PALM-GROSS, INC., Appellant,
v.
Henry PAPER and Anthony V. Pugliese, III, Appellees.
No. 93-0732.
District Court of Appeal of Florida, Fourth District.
July 6, 1994.
*666 Daniel S. Pearson and Lucinda A. Hofmann, Holland & Knight, Miami, for appellant.
Robert M. Weinberger, Cohen, Chernay, Norris, Morici, Weinberger & Harris, North Palm Beach, for appellee Pugliese.
PARIENTE, Judge.
The plaintiff (lender) appeals the trial court's determination of usury in connection with a loan of $200,000 to defendants' (borrowers') real estate partnership. The lender limits its challenge to the trial court's finding of usurious intent. From our review of the record, the trial court's order entered after a non-jury trial is supported by substantial competent evidence. The existence of a "usury savings clause" did not preclude, as a matter of law, a finding of usury. We affirm.
The borrowers were partners in a real estate partnership which required capital to build a multi-tenant office building. The partnership owned land consisting of three prime lots in West Palm Beach worth $1,700,000, subject to a purchase money mortgage of $1,100,000 that was due shortly. To satisfy the purchase money mortgage and construct an office building on the land, the borrowers went to a bank to secure a loan. After obtaining an appraisal of the partnership assets and the project, the bank agreed to lend the partnership most of the needed capital. The loan amount, however, was $200,000 short of the estimated partnership needs. The borrowers needed a "bridge-the-gap loan."
The borrowers approached Walter Gross (Gross), a real estate developer, and suggested that he become an equity partner in the partnership for an investment of $200,000. Gross reviewed the partnership assets and appraisal. Fully aware of the partnership's financial picture and needs, he refused to become an investor, but agreed to lend the partnership $200,000 and charge an interest rate of 15% for eighteen months, amounting to $45,000 in interest charges. By the time of closing, Gross had formed the appellant corporation, Jersey Palm-Gross, Inc., for the purpose of making the loan.
Shortly before closing, Gross presented the borrowers with loan documents which included a demand for a 15% equity interest in the partnership as additional consideration for making the loan. Gross did not attempt to hide his motives for exacting an interest in the partnership. He testified that the partnership interest was an inducement to make the loan, even though he had previously agreed to loan the money at a 15% interest rate. Gross knew the value of the partnership based on the borrowers' disclosures and was aware of the borrowers' urgent need for funds. The borrowers were in desperate financial straits. With closing imminent, they were in no position to bargain or to seek another source of the money.
The lender brought suit when the borrowers failed to repay the loan. The borrowers' defense was that the loan was usurious from its inception, and therefore, an unenforceable debt because the consideration for the loan, which included the partnership interest and the 15% interest rate, totaled 45% per annum in interest.
The four requirements necessary to establish a usurious transaction are:
1. A loan, either express or implied.
2. An understanding that the money must be repaid.
3. In consideration of the loan, a greater rate of interest than is allowed by law is paid or agreed to be paid by the borrower.
4. Intent to charge a usurious rate, sometimes referred to as corrupt intent.
Dixon v. Sharp, 276 So.2d 817 (Fla. 1973); Rollins v. Odom, 519 So.2d 652 (Fla. 1st DCA 1988), rev. denied, 529 So.2d 695 (Fla. 1988); Rebman v. Flagship First Nat'l Bank, 472 So.2d 1360 (Fla. 2d DCA 1985).
*667 Under Florida law, sections 687.04 and 687.071, Florida Statutes (1993) provide statutory causes of action which allow a borrower to seek affirmative relief against a lender who has made a usurious loan. Civil usury involves loans of $500,000 or less and an interest rate of greater than 18% and less than 25%. See § 687.03, Fla. Stat. (1993). Criminal usury involves any loan amount with a rate of interest greater than 25% but not in excess of 45%. See § 687.071, Fla. Stat. (1993). The penalties for civil usury include forfeiture of all interest charged; the civil penalties for criminal usury are forfeiture of the right to collect the debt. See § 687.04, Fla. Stat. (1993). In the case of either criminal or civil usury, the lender's willfulness to charge an excessive interest rate is determined by considering all of the circumstances surrounding the transaction. Dixon; Rollins. This might involve looking beyond the terms of the loan documents. Antonelli v. Neumann, 537 So.2d 1027 (Fla. 3d DCA 1988). If a borrower promises or is otherwise required to pay a bonus or other consideration as an inducement to the lender to make the loan, such added obligations may be considered interest and can render a loan usurious. See Cooper v. Rothman, 63 Fla. 394, 57 So. 985 (1912).
The trial court here made factual findings, on the evidence presented, that the net equity value of the partnership at the time the loan was made, based on partnership assets of $1,700,000 and debts of $1,100,000, was $600,000. The lender does not challenge those findings on appeal. The lender also does not dispute the trial court's finding that the lender charged usurious interest when it exacted a 15% interest in the partnership as an additional condition of making the loan. The trial court correctly calculated the effective interest rate at 45% per annum over the eighteen month loan period, with the partnership interest of $90,000 (15% interest in partnership valued at $600,000) added to the $45,000 in interest charges (15% interest rate on loan of $200,000). The cost of the loan totaled $135,000, which was an effective interest rate of 45% on a loan of $200,000 for the eighteen month period of the loan.[1]
While the lender does not dispute the mathematical calculations on appeal, it contends it lacked the requisite intent. It asserts that knowledge of the amount received as consideration for the loan does not equate with corrupt intent to receive more than a legal rate of interest. The lender points to the trial court's findings of fact as negating the element of intent, partly because of the inclusion of the following statement:
Though the court does not believe that Jersey Palm-Gross, Inc. harbored ill will or malevolent intent in making the loan to Jersey Palm Associated in consideration of receiving both a 15% interest in the partnership and payments of interest at the rate of 15% per annum on the principal amount of the loan, the court finds that plaintiff was aware of the value of the consideration which it was receiving or had a right to receive pursuant to the Loan Documents, and that the value of this consideration, when spread over the 18 month term of the loan exceeded 25% of the amount of the loan (emphasis added).
Within the same written order the court also made the additional finding:
As Plaintiff knew the value of the consideration which it received in consideration for making the $200,000.00 loan and further, the Plaintiff knowingly and willingly charged and accepted this consideration, *668 the Court concludes that Plaintiff possessed the requisite intent to render the $200,000.00 loan transaction usurious.
The determination of intent is the responsibility of the trier of fact. Szenay v. Schaub, 496 So.2d 883 (Fla. 2d DCA 1986); Rebman. The trial court clearly found that the lender purposefully charged a usurious interest rate, and therefore, possessed the requisite intent. Its statement that "the lender did not harbor ill will or malevolent intent" is not inconsistent with its finding of willfulness. The criminal usury statute uses the terms willfully and knowingly, not "ill will or malevolent intent."[2] The supreme court in Dixon cited with approval the definition of willfully and knowingly set forth in Chandler v. Kendrick, 108 Fla. 450, 146 So. 551, 552 (1933):
A thing is willfully done when it proceeds from a conscious motion of the will, intending the result which actually comes to pass. It must be designed or intentional, and may be malicious, though not necessarily so.
We agree that mathematical calculations alone do not equate with usurious intent. Dixon. However, here the lender knew at the outset the total value of the amount he was receiving in consideration for making the loan. Gross, the lender's president and sole stockholder, is a developer with 40 years experience and not an unsophisticated lender. He knew that the borrowers had an urgent need for the money. He dictated the terms of the loan. The fact that the borrowers were "in distress" or "necessitous" when the loan was made is as significant as the fact that the lender dictated the terms of the loan. Compare Dixon, 276 So.2d at 819. Our supreme court explained the purpose of Florida's usury statute:
The very purpose of statutes prohibiting usury is to bind the power of creditors over necessitous debtors and prevent them from extorting harsh and undue terms in the making of the loans.
Dixon, 276 So.2d at 820, citing Chandler, 146 So. at 551.
The lender's claimed ignorance of the specifics of Florida's usury laws does not preclude a finding of intent. Shorr v. Skafte, 90 So.2d 604, 607 (Fla. 1956); Rollins; Ross v. Whitman, 181 So.2d 701 (Fla. 3d DCA), cert. denied, 194 So.2d 624 (Fla. 1966). Gross' testimony that he did not intend to charge an unlawful rate of interest is also not determinative. Rollins. Obviously, such testimony is self-serving.
Despite the lender's assertions to the contrary, the requisite intent was established by proving the lender's knowledge of the amount of interest to be received and intent to receive the amount charged. North American Mortg. Investors v. Cape San Blas Joint Venture, 378 So.2d 287, 291 (Fla. 1979); Dixon; Shorr; Rollins; Curtiss Nat'l Bank of Miami Springs v. Solomon, 243 So.2d 475, 477 (Fla. 3d DCA 1971); River Hills, Inc. v. Edwards, 190 So.2d 415, 424 (Fla. 2d DCA 1966). The evidence thus fully supports the trial court's conclusion that the lending scheme resulted in interest in excess of 25% per annum and that such result was intended by the lender.
A more troublesome question is whether the existence of a contractual disclaimer of intent to violate the usury laws commonly known as a "usury savings clause" in the loan documents in this case removes the determination of usurious intent from a factual inquiry and conclusively proves as a matter of law that the lender could not have "willfully" or knowingly charged or accepted an excessive interest rate.[3] The trial court *669 held that "the exculpatory language [usury savings clause] inserted into the $200,000.00 Promissory Note does not negate Plaintiff's knowledge that it was charging and intended to charge consideration for making the loan in excess of 25% of the value thereof."
The lender relies on Forest Creek Dev. Co. v. Liberty Savings & Loan Ass'n, 531 So.2d 356 (Fla. 5th DCA 1988), rev. denied, 541 So.2d 1172 (Fla. 1989), which affirmed the trial court's dismissal of a usury count where the mortgage note contained a savings clause providing that interest would not exceed the maximum rate allowable by law. If it did exceed the maximum rate, the provision added that the excess sum would be credited as a payment of interest. The fifth district does not discuss the underlying facts concerning the loan transaction, including whether the mortgage note was an adjustable mortgage rate. Forest Creek cites no authority for holding that the usury count was properly dismissed because of the usury savings clause. No other Florida case goes as far, and we expressly disagree with the blanket holding in Forest Creek. We note, however, that there is a distinction between transactions which are usurious at the outset as in the case before us and transactions which over the course of the loan may become usurious as a result of a variable interest rate.
In Szenay v. Schaub, 496 So.2d at 885, the second district approved the trial court's application of the usury savings clause in the mortgage note and the trial court's conclusion that "even though the mortgage and the note called for a usurious rate of interest, appellees had no intent to charge appellants such a rate." Thus, the court found no abuse of discretion on the part of the trial judge in making a factual finding of no usury. The opinion does not discuss whether any other facts influenced the trial court's decision, but treats the issue of the usury savings clause as evidence relating to the issue of intent.[4] Similarly, the trial court here considered the usury savings clause on the factual issue of intent.
First American Bank and Trust v. International Medical Ctrs., Inc., 565 So.2d 1369 (Fla. 1st DCA 1990), rev. denied, 576 So.2d 286 (Fla. 1991) discusses usury savings clauses, but only in dicta. The first district had reversed the trial court's finding of usury on other grounds, and therefore, stated that it was unnecessary to review the sufficiency of the record supporting the trial court's ruling. In commenting on the usury savings clause in the loan document, the court noted:
In a case such as this, where the effective interest rate found to be usurious is so near the allowable maximum depending on disputed legal principles of valuation, a strong showing indeed must be made to invalidate such provisions in the loan document.
Id. at 1374. Certainly, this statement is a tacit acknowledgment that the determination of usury by the finder of fact would not be legally precluded merely by the insertion of a usury savings clause. Indeed, the court's comments could be interpreted as authority for the proposition that where the interest rate charged is far in excess of the legal rate (versus close to the allowable maximum), such clauses need not be given effect. The appellate court's role is limited to a sufficiency of the evidence under review.
In the most recent Florida case to discuss usury savings provisions, the second district expressly rejected the notion that a disclaimer clause in a promissory note precluded a finding of usury and held that a factual dispute *670 remained whether the alleged illegal interest was usurious. Plantation Village Ltd. v. Aycock, 617 So.2d 729 (Fla. 2d DCA 1993). The lender argued that the disclaimer clause was credible evidence of lack of corrupt intent. The second district also questioned, but did not decide, whether a disclaimer clause can ever save the lender from criminal usury pursuant to section 687.01, because the "savings" provisions of Florida's usury laws, section 687.04(2), apply only to civil usury.
Section 687.04(2) allows a lender a complete defense to civil usury if prior to the institution of an action by a borrower or the filing of a defense, the lender notifies the borrowers of any allegedly usurious overcharge and refunds the amount of any overcharge. Thus, Florida's usury law affords lenders a method to avoid a claim of usury by taking the affirmative action of notification and refund before the borrower raises the claim of usury in litigation. On the other hand, a usury savings clause is an expression of the lender's intent to refund the usurious charges only after a claim of usury is raised and challenged by the borrower. We find the blanket application of a usury savings clause to defeat a usury claim as a matter of law to be inconsistent with section 687.04(2). The fact that the legislature has created certain exceptions to the application of the usury laws and a procedure for avoiding a claim of usury does not in our view require us to interpret usury savings clauses to grant commercial lenders automatic immunity from the reach of our state's usury statute so as to nullify its effect.
A review of the decisions nationwide reveals that only North Carolina, Texas and Connecticut have discussed the effect of usury savings clauses on otherwise usurious transactions.[5] The North Carolina Supreme Court has invalidated usury savings clauses as against the public policy of the state.[6] The North Carolina Supreme Court explained its rationale in Swindell v. Federal Nat'l Mortg. Ass'n, 330 N.C. 153, 160, 409 S.E.2d 892, 896 (1991):
The [usury] statute relieves the borrower of the necessity for expertise and vigilance regarding the legality of rates he must pay. That onus is placed instead on the lender, whose business it is to lend money for profit and who is thus in a better position than the borrower to know the law. A `usury savings clause,' if valid, would shift the onus back onto the borrower, contravening statutory policy and depriving the borrower of the benefit of the statute's protection and penalties.... A lender cannot charge usurious rates with impunity by making that rate conditional upon its legality and relying upon the illegal rate's automatic rescission when discovered and challenged by the borrower.
Texas courts since 1937 have repeatedly acknowledged the validity of the usury savings clauses, but still hold that a usury savings clause will not necessarily relieve the lender from the consequences of the usury laws when the transaction is clearly usurious at the outset. Nevels v. Harris, 129 Tex. 190, 102 S.W.2d 1046 (1937); Woodcrest Assocs., Ltd. v. Commonwealth Mortg. Corp., 775 S.W.2d 434 (Tex. Ct. App. 1989). In Nevels, the Texas Supreme Court, in acknowledging the validity of usury savings clauses, gave the following strongly worded caveat:
Of course we do not mean to hold that a person may exact from a borrower a contract that is usurious under its terms, and then relieve himself of the pains and penalties visited by law upon such an act by merely writing into the contract a disclaimer of any intention to do that which under his contract he has plainly done.
102 S.W.2d at 1050. In explaining this caveat, the Texas appellate court in First State Bank v. Dorst, 843 S.W.2d 790 (Tex. Ct. App. 1992) gave the following example:
As a simple example, a creditor may not specifically contract for a 30% interest rate and then avoid the imposition of usury *671 penalties by relying on a savings clause that declares an intention not to collect usurious interest.
Id. at 793. In contrast, "a savings clause may cure an open-ended contingency provision the operation of which may or may not result in a charge of usurious interest." Smart v. Tower Land & Inv. Co., 597 S.W.2d 333, 340-41 (Tex. 1980); First State Bank. Despite acknowledging the validity of usury savings clauses, the Texas courts are quick to point out that:
The effect of such clauses in a particular case is largely a question of construing the terms of the savings clauses as a whole and in light of the circumstances surrounding the transaction.
Woodcrest, 775 S.W.2d at 438; Nevels, 129 Tex. at 197-98, 102 S.W.2d at 1049-50. The inquiry is thus fact based.
While we are unwilling to hold that usury savings clauses are unenforceable as against this state's public policy, neither are we willing to hold that the insertion of a usury savings clause in one of several documents to a loan transaction will shield the lender from the reach of Florida's usury laws as a matter of law. A usury savings clause is one factor to which the finder of fact should look in determining whether all of the circumstances surrounding the transaction support a finding of intent on the part of the lender to take more than the legal rate of interest for the use of the money loaned. Where the actual interest charged is close to the legal rate, or where the transaction is not clearly usurious at the outset but only becomes usurious upon the happening of a future contingency, the clause may be determinative on the issue of intent.
Here, the amount charged for the loan exceeded the lawful rate of interest by 27%. The usurious amount was exacted at the outset, and did not depend on the occurrence of a future contingency, which might or might not have made the loan usurious. The borrowers were in desperate need of money. The lender had full knowledge of the borrower's financial situation and took full advantage of the situation by overreaching. The usurious charges did not occur by happenstance, but through the lender's purposeful actions. We find that the insertion of a usury savings clause in a single document does not save this lender under these circumstances from the usury penalties, nor preclude the trial court's finding of usurious intent. We will not substitute our judgment for that of the trial court.
Accordingly, the judgment of the trial court is affirmed. We certify conflict with Forest Creek.
GLICKSTEIN, J., concurs.
FARMER, J., dissents with opinion.
FARMER, Judge, dissenting.
The majority upholds the decision of a trial judge finding a criminal usury violation in this commercial loan transaction, notwithstanding a specific provision in the loan documents disavowing any intent to violate the usury statutes and automatically amending the transaction to remove the offending provisions and credit any adjustments necessary if the court should so construe them. I disagree with the finding of a usury violation.
After asserting that the "borrowers were in desperate need of money," and that the "lender had full knowledge of the borrower's financial situation," the majority concludes that the lender was guilty of taking "full advantage of the situation by overreaching." Not only is there no factual finding by the trial judge to this effect, but as the majority tacitly recognizes, he actually absolved the lender of any improper motive.[7]
*672 The traditional essence of a Florida usury violation is a "corrupt intent to take more than the legal rate for the use of the money" lent. Stewart v. Nangle, 103 So.2d 649 (Fla. 2d DCA 1958); Clark v. Grey, 101 Fla. 1058, 132 So. 832 (1931). Even assuming there were evidence, which is lacking here, to support a finding that the partnership value taken for the loan was $90,000, mere knowledge of that value, coupled with a knowing and willful acceptance of that value, in my opinion would not alone amount to the required "corrupt intent to take more than the legal rate for the use of money."
The majority's contrary conclusion represents an attempt to shoehorn this case into the "necessitous borrower" class, see Chandler v. Kendrick, 108 Fla. 450, 146 So. 551, 552 (1933), for whose benefit the usury statutes were designed "to bind the power of creditors * * * and prevent them from extorting harsh and undue terms in the making of loans." Id. As I will attempt to show, however, the economic realities of the marketplace facing commercial borrowers bear no relation to the "necessitous borrower" that the legislature or court envisioned.
The facts show that the borrower was a developer who sought a bridge-the-gap loan to cover interim cash needs between land acquisition and the closing of the construction loan for a multiple tenant office building. When the partnership was ready for the construction loan, the land was valued at $1,700,000 and the partnership already had debts of $1,100,000. The construction lender was given a first mortgage on the land to secure payment of a $2,123,000 construction loan, however. Thus developer was forced to seek second mortgage or unsecured financing for this loan. Unable to find such financing from any other source, borrower turned to this lender.
In agreeing to make the loan at an interest rate of 15%, the lender insisted on being given a 15% share of the partnership developing the project.[8] The trial judge and the majority engage in some "creative accounting" to arrive at a conclusion that the "net equity" value of the partnership share was $600,000. They accomplish this result by subtracting the partnership's debts ($1,100,000) before the construction loan from the value of the land ($1,700,000). It may be homespun logic on my part, but I do not see how the construction loan can be so advantageously left out of the accounting equation. When the $2,123,000 loan is considered, the partnership has no "net equity", and the value of any individual partner's share was at best a mere expectancy. As events later proved, the dreams of profits never materialized.
The agreements between borrower and lender contained a specific provision, which the court calls a "usury savings clause." This clause provided that, if borrower's grant to the lender of the partnership share should be deemed to be in the nature of a time charge for the use of money and as so construed ultimately result in a violation of Florida's usury laws, then the transaction would be recalculated and restructured so as to eliminate any usury violation and to return to the borrower any excessive charges already paid. If, as I have concluded, the partnership share had no value, there is nothing to aggregate with the stated interest to make the loan usurious, and therefore the savings clause would be unnecessarily applied.
Both courts have concluded that the partnership grant violated the usury laws and that the violation cannot be avoided by the *673 savings clause. They base this conclusion on the theory that the parties' savings clause is merely "some evidence" of an intent not to violate the usury laws, which the finder of fact is free to give such weight as the finder deems desirable. With an implicit sweep of the public policy broom, they reject the notion that this provision should be treated with any greater import, short of conclusive effect, than the impotent interpretation of "some evidence". I believe that this court's decision fails to give the operative provision the categorical effect that these commercial parties themselves intended it have when contracting.
In Continental Mortgage Investors v. Sailboat Key Inc., 395 So.2d 507 (Fla. 1981) [CMI], which involved a usury issue not unlike the one found in this case, Justice Sundberg wrote the following about Florida's statutory usury laws:
"The usury statute itself, fraught as it is with exceptions, belies the imputation of a strong public policy. See § 687.031, Fla. Stat. (1975). In 1975 The Florida Consumer Finance Act allowed interest on small loans as high as 30% per annum, in contrast to the general usury ceiling of 10% per annum. § 516.031, Fla. Stat. (1975). The Savings Association Act made usury limits simply inapplicable to building and loan associations. §§ 665.395, 687.031, Fla. Stat. (1975). Under the Banking Code, banks could charge up to 18% per annum on certain loans. § 659.181, Fla. Stat. (1975). Florida has long recognized the general exception to usury laws of the time-price doctrine. See Davidson v. Davis, 59 Fla. 476, 52 So. 139 (1910). The usury law does not apply to the sale of bonds, or mortgages on those bonds, section 687.031(1), Florida Statutes (1975), or to the transfers of negotiable paper in certain cases, section 687.04, Florida Statutes (1975).
The legislature recently raised the maximum interest rates allowable under the usury laws, demonstrating that this public policy is at very least relatively flexible in a confrontation with commercial reality. See Ch. 79-274, § 13, Laws of Florida. Nor do we consider usury protections fundamental to a legal system. The defense of usury is a creature entirely of statutory regulation, and is not founded upon any common-law right, either legal or equitable. Matlack Properties, Inc. v. Citizen & Southern National Bank, 120 Fla. 77, 162 So. 148 (1935). Finally, we note the limited effect of the usury laws upon a contract. `[T]he usury statutes in this jurisdiction do not have the effect of invalidating contracts for [usurious] interest . .. but only accord to the obligor the personal privilege of setting up ... affirmative defenses of usury in respect to such contracts.' Yaffee v. International Co., 80 So.2d 910, 912 (Fla. 1955)." [e.o.]
395 So.2d at 509. Nothing that Justice Sundberg said in 1981 would be any different today, except for some of the digits.
There is nothing in the statutes, whence all public policy on the subject of usury originates, that expressly condemns the kind of provision used here or that limits its effect to an empty evidential consequence. On the contrary, one statutory provision that is more directly applicable to this case implies that the savings clause should be wholly efficacious to its obvious purpose: section 687.04(2), Florida Statutes (1993), expressly allows a post facto purge of any simple usury violation. To achieve the statutory purge, section 687.04(2) simply requires that, before any civil action has been filed, the lender must give the borrower notice of the amount of any usurious overcharge and tender a refund of the overcharge already collected, along with an "adjustment" of the loan documents to memorialize that the borrower "will not be required to pay further interest in excess of the amount permitted by s. 687.03." The majority does not explain why under anything found in chapter 687 such a purge could not be built ab origine like this savings clause into the loan documents themselves and achieve the same effect. They do not seem to consider whether if usury can be purged ex post facto, as the statute clearly allows, it can also be avoided anticipatorily, which the statute does not clearly prohibit.
Frankly, without a statutory prohibition on usury savings clauses, I am quite unwilling to impose a judge-made gloss denying commercial[9] *674 parties the right to contract around Florida's usury statutes. As Justice Sundberg so convincingly showed in CMI, certainly commercial parties already have considerable leeway to avoid usury violations under the current scheme. In addition to the above statutory purge, sections 687.12 and 687.13 still exempt most institutional lenders from the usury laws altogether; and subsections (2), (3), (4) and (5) of section 687.03 exempt a huge number of commercial loan transactions from the chapter's provisions.
It is even more interesting to contemplate that, as to loans greater than $500,000, section 687.03(4) actually exempts stock options, interests in profits, receipts, or residual values which have been charged, reserved or taken as an advance or forbearance for the loan, so long as the value of such property interest is dependent on the success of the venture in which the loan proceeds are used. It is undeniable that the grant of the 15% share in the partnership was nothing if not dependent on the future success of the real estate venture in which the proceeds were used. Hence, under this statute, partnership shares taken as consideration for making the loan are plainly permissible in some loans, so there is nothing especially pernicious about lenders taking shares of the borrower's venture for their loan. If the amount here exceeded $500,000, we would not even be talking about a usury violation, because the entire transaction would have been exempted from this defense.
Equally important, if those statutory exemptions are not enough, there is always the right of commercial parties to an interstate loan with an interest rate that would be deemed usurious under Florida law to contract for the application of the governing law of a different though relevant state. In CMI, Florida adopted the generally held view that "usury laws are not so distinctive a part of a forum's public policy that a court, for public policy reasons, will not look to another jurisdiction's law which is sufficiently connected with a contract and will uphold the contract."[10] 395 So.2d at 509.
The principal rationale for adopting this choice of law rule was the "rule of validation;" i.e., in the absence of a choice of law provision in the parties' contract, the court will apply the law of the related jurisdiction that favors the agreement. CMI, 395 So.2d at 513. Indeed, if the foreign jurisdiction has a normal relation to the transaction, the good faith of the parties in so choosing is irrelevant. 395 So.2d at 512-13. It is perhaps supremely ironical that, if the parties' agreements here had contained no provision choosing Florida law, the court almost surely would have used the conflict of laws calculus commonly applied, see, e.g., OFS Equities Inc. v. Conde, 421 So.2d 651 (Fla. 3d DCA 1982), and thus found a validating jurisdiction in the place of the lender's home office, where the payments on the notes were to have been made.
The critical idea underlying the rule of validation is that it is absurd to think that contracting parties would choose, or have chosen, the law of a forum that would frustrate what they have undertaken to do. Commercial law does not indulge the assumption, a priori, that contracting parties have wasted their time and thus intend to achieve nothing by their bargain. Rather the law proceeds, or should, on the presumption that the parties intended a valid agreement; the mission of the court must be to save their bargain if it can be done. Judge-made rules should not be crafted to invalidate contractual provisions that statutory law has not prohibited. Here, this court has stretched to uphold an invalidation, rather than the contrary.
The majority brushes aside the decision in Forest Creek Development Co. v. Liberty Savings & Loan Ass'n, 531 So.2d 356 (Fla. 5th DCA 1988), rev. denied, 541 So.2d 1172 (Fla. 1989), in which because of a savings *675 clause, the fifth district did not even permit a usury defense to survive a mere motion to dismiss. Forest Creek thus appears to stand for the proposition that the savings clause may bar a usury defense as a matter of law. I do not think, however, that this precedent can be discounted to the point of oblivion merely because one district court thought the rationale for its decision so obvious as not to require any belaboring.[11]
The loan transaction in question was made in March 1990. The fifth district released its decision in Forest Creek in 1988. It is not farfetched to contemplate that when this out-of-state lender was asked to consider this highly risky loan, its lawyer relied on Forest Creek in approving the structure of the transaction and the use of the savings clause without a choice of foreign law provision.[12] I should have thought that reliance on unambiguous case authority from a Florida district court of appeal upholding a particular form of agreement against a usury attack would be dispositive. The majority does not explain why this lender's reliance on Forest Creek should not result in validation of the parties' precise agreement.
As I have already stressed, the commercial realities were stacked against the kind of financing sought by this borrower from the very beginning. The unavailability of a commercial loan in certain kinds of circumstances like these is evidence not of a "necessitous borrower," as the court intended that term in Chandler, but of economic decisions in the marketplace. Second mortgage or unsecured financing for as yet undeveloped property is highly risky and quite unattractive to lenders in times, as here, of economic slowdown.
Such lending for this kind of commercial use, when it is even available, is reserved for only the most creditworthy borrowers, who have the independent financial resources to pay the loan if the venture fails. No one suggests that this partnership had either the credit reputation or the unencumbered assets to measure up to that standard. For this kind of commercial credit the marketplace is all but nonexistent, and the ultimate terms when available will surely be unique and costly. But this is a function of the commercial risk; it is not the working of "harshness or undue terms." In any case it simply has no semblance to the person who seeks a consumer loan for purely household purposes.
Having said all of the foregoing, I hasten to add that ascribing to savings clauses a categorical avoidance of usury, as in Forest Creek, might be too sweeping. To carry out the obvious statutory purpose in commercial cases, I would give the savings clause a slightly less far-reaching effect. In my opinion, these clauses should be treated as creating a strong presumption of avoidance of any usury violation, subject to being overcome only by clear and convincing evidence of criminal loan-sharking in its classic sense. The lender must be shown clearly and convincingly to have intended a criminal violation of the usury laws and to charge purely for interest above the criminal limit, and that the savings clause merely represents a bad faith attempt to mask the criminal violation.
The sage advice of Polonius was never more true than here.
"Neither a borrower nor a lender be; For loan oft loses both itself and friend, And borrowing dulls the edge of husbandry."
Hamlet, act I, scene iii. In this instance, the borrower has failed on the subject real estate project and gone bankrupt, while  with our affirmance of the final judgment  the hapless lender has lost all interest due for the *676 loan, the principal has been forfeited, and the lender must now pay his borrower's attorney's fees. Borrower and loan are gone, and husbandry (meaning commercial lending) has been flattened in the process. All this, mores the pity, without any cluster of words from our usury statutes unmistakably requiring this result.
NOTES
[1] The dissent asserts the trial court and this court engaged in creative accounting in the calculations of the partnership's value because it did not consider the effect that the newly acquired loans from the bank and the lender would have on the partnership balance sheet. We note that the lender does not on appeal question the trial court's calculations in valuing the partnership interest or in arriving at an usurious interest rate. It is clear from the record that the appraisal of the land at $1,700,000 was based on the unimproved land.

The dissent engages in speculation outside the record as to what effect the receipt of the loan amount from the bank would have on the net value of the partnership interest. However, part of the loan proceeds were to be used to pay off the existing liability of $1,100,000. The remaining proceeds were to be used to construct an office building which would enhance the value of the partnership by a comparable asset. Therefore, the loan monies received would most likely be offset by the reductions in preexisting liabilities and increases in assets.
[2] "Malevolent is defined as 1: having, showing or indicative of intense often vicious ill will: filled with or marked by deep-seated spite or rancor or hatred ... 2: productive of harm or evil...." Webster's Third New International Dictionary (unabridged) 1367 (3d 1986).
[3] The "usury savings clause" contained in the promissory note states:

Nothing herein contained, nor in any instrument or transaction related hereto, shall be construed or so operate as to require the maker, or any person liable for the payment of the loan made pursuant to this note, to pay interest in an amount or at a rate greater than the highest rate permissible under applicable law. Should any interest or other charges paid by the maker, or any parties liable for the payment of the loan made pursuant to this note, result in the computation or earning of interest in excess of the highest rate permissible under applicable law, then any and all such excess shall be and the same is hereby waived by the holder hereof, and all such excess shall be automatically credited against and in reduction of the principal balance, and any portion of said excess which exceeds the principal balance shall be paid by the holder hereof to the maker and any parties liable for the payment of the loan made pursuant to this note, it being the intent of the parties hereto that under no circumstances shall the maker, or any parties liable for the payment of the loan hereunder, be required to pay interest in excess of the highest rate permissible under applicable law.
[4] Without discussing the law concerning usury savings clauses, in the case of In re Concrete Express, Inc., 87 B.R. 718, 719 (S.D.Fla. 1988), the bankruptcy court held that while a usury savings provision "by itself is insufficient to avoid an adjudication of usury, it is credible evidence of the parties' intention that usurious interest not be present in the agreement."
[5] Thirty-nine states have usury laws, including Florida.
[6] A Connecticut appellate court recently followed the North Carolina rationale. Countrywide Funding v. Kapinos, Case No. XX-XXXXXXX, 1993 WL 118070 (Conn.Super.Ct. April 2, 1993) (unpublished).
[7] The trial court's final judgment contains the following finding of fact:

"16. Though the Court does not believe that [lender] harbored ill will or malevolent intent in making the loan to [borrower] in consideration of receiving both a 15% interest in the Partnership and payments of interest at the rate of 15% per annum on the principal amount of the loan, the Court finds that [lender] was aware of the value of the consideration which it was receiving or had a right to receive pursuant to the Loan Documents, and that the value of this consideration, when spread over the 18 month term of the loan exceeded 25% of the amount of the loan."
Final Judgment, at 3-4. In its conclusions of law, the court explained:
"6. As [lender] knew the value of the consideration which it received in consideration for making the $200,000.00 loan and further, the [lender] knowingly and willingly charged and accepted this consideration, the Court concludes that [lender] possessed the requisite intent to render the $200,000.00 loan transaction usurious." [c.o.]
Final Judgment, at 6.
[8] It goes without saying that an interest in a partnership is worth only what assets and profits the partnership can generate, less its debts and obligations. § 620.645, Fla. Stat. (1993). Here the partnership owned the undeveloped land, but the land was subject to the first mortgage of the construction lender. Hence the value of the interest in this partnership was ultimately dependent on the partnership turning a profit in the development of the land and the ultimate sales of completed units. A partner has a corresponding obligation to share pro rata in the payment of partnership debts or losses. § 620.63, Fla. Stat. (1993).
[9] I stress the purely commercial setting of this case. I express no opinion as to what my views would be if the "necessitous borrower" here were a consumer and the loan were entirely for household purposes.
[10] As Justice Sundberg pointedly noted in his opinion for the court in CMI, the "few courts that do rely on a public policy exception in a usury-choice of law situation invariably are dealing with the individual, and often consumer, borrower." 395 So.2d at 509. To repeat, this case concerns only commercial parties.
[11] I also recognize that both Szenay v. Schaub, 496 So.2d 883 (Fla. 2d DCA 1986), and First Am. Bank & Trust v. Int'l Medical Ctrs. Inc., 565 So.2d 1369 (Fla. 1st DCA 1990), rev. denied, 576 So.2d 286 (Fla. 1991), can be thought to have employed the "some evidence" standard used by the majority. In my opinion, however, the proper effect of these usury savings clauses lies somewhere between the conflicting cases but closer to Forest Creek. I agree that this court's decision today, along with Szenay and First American Bank, are in obvious conflict with the fifth district's decision in Forest Creek and that this conflict should be certified.
[12] When the law cuts against a party, we are not hesitant to say that ignorance of the law is no excuse. Should not a healthy equitable symmetry require us to indulge the presumption that everyone knows the law when extant precedent would validate a commercial transaction?